IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2024 Session

## STATE OF TENNESSEE v. WILLIAM DARNELL BRITTON

**Appeal from the Criminal Court for Davidson County**
**No. 2020-C-1395     Mark J. Fishburn, Judge**

_____

### No. M2023-01779-CCA-R3-CD

_____

The Davidson County Grand Jury indicted the Defendant, William Darnell Britton, for one count of first-degree premeditated murder. Thereafter, a jury convicted the Defendant of the lesser included offense of second-degree murder, and the trial court sentenced him to eighteen years at one hundred percent in the Tennessee Department of Correction. On appeal, the Defendant argues the trial court committed reversible error (1) in allowing the prosecutor to cross-examine him about his inflammatory rap lyrics and videos and (2) in its jury instructions. After review, we conclude that the trial court abused its discretion in admitting evidence of the Defendant's rap lyrics/videos and that this error was not harmless. We also conclude that the trial court erred in failing to instruct on "first aggressor proof" in conjunction with the self-defense instruction and that this error was not harmless beyond a reasonable doubt. Accordingly, we reverse the Defendant's conviction for second-degree murder and remand this case to the trial court for a new trial.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed
and Remanded**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and JOHN W. CAMPBELL, SR., JJ., joined

David L. Raybin, Nashville, Tennessee (motion for new trial and on appeal); Caleb Cassell, Nashville, Tennessee (at trial), for the appellant, William Darnell Britton.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

**Trial.** Detective Charles Duke of the Metro Nashville Police Department testified that on March 27, 2020, he was called to the crime scene at the intersection of Blank Street and Herman Street in Nashville. When he arrived, he observed several officers attempting to provide medical assistance to the victim, Kendall Ostine, who was lying on the sidewalk on Herman Street a short distance from the intersection with Blank Street.

Detective Duke later obtained video surveillance of the intersection from two nearby apartment complexes. He reviewed the first video, which did not have audio, and explained that this recording showed the victim turning from Herman Street onto Blank Street, walking up Blank Street, and then leaving the view of the camera for several minutes. He said the victim reappeared in the camera's view and walked back down Blank Street toward its intersection with Herman Street. The victim then stopped at the corner and spoke with a man who was not the Defendant. The victim then walked away from the corner and down Herman Street, where he stopped, turned, and pointed at something across the street. Detective Duke stated that a glitch in the video recording occurred, which caused it to jump frames, and the victim was no longer in view. He noted that this glitch in the recording occurred when the shooting incident took place. Detective Duke said this recording showed a vehicle on the other side of the street with the passenger door open and a person standing in a nearby doorway. This person stepped off the sidewalk and onto the street and then walked back as the victim stopped and turned around. Detective Duke stated that after the video glitch occurred, the recording showed two vehicles driving down the street, and he said these two vehicles matched the descriptions given by witnesses of the cars that left the scene immediately after the shooting.

Detective Duke next reviewed the second video recording, which contained audio, that captured the sounds of nine gunshots. He stated that prior to these gunshots, the recording did not capture the sounds of yelling. However, Detective Duke said that after hearing the gunshots, the recording captured yelling from people on the video. Detective Duke said this recording showed the Defendant and another man sitting on one side of the road and the victim in a different area. It then showed the person with the Defendant run across the street and jump into a Kia Optima before the Optima drove away.

The State then played a third video recording, which did not depict the shooting incident but did capture audio during the incident because it was the closest camera to the incident. After listening to this recording, Detective Duke said he heard people talking but could not determine what they were saying. He added that after the gunshots were fired, he could hear people screaming.

On cross-examination, Detective Duke acknowledged that these apartment cameras were not the best at capturing sound. Detective Duke agreed that the first video recording, from the housing authority, seemed to show the victim, with his black hoodie on, leaning against a wall, although he could not tell which direction the victim's head was facing. The recording then showed the victim extending his arm out, perhaps pointing at the Defendant, before the victim made a jabbing motion at the Defendant, which indicated some communication between the Defendant and the victim. At the time, Detective Duke did not know what the victim was saying or where the victim's other hand was. After watching the apartment recording of the shooting incident, Detective Duke said that the person on the left was the shooter and that the recording did not show the victim across the street. He admitted that the victim's hands were obscured by the wall and the vehicles and were therefore not visible on the recordings immediately preceding and during the shooting itself. He said these recordings also did not show what the victim was saying around the time of the shooting.

On redirect examination, Detective Duke acknowledged that he did not know who started the conversation between the Defendant and the victim. He said that because there was not a lot of distance between the Defendant and the victim, the Defendant should have been able to tell whether the victim had a weapon in his hand. Detective Duke agreed that the Defendant walked across the street toward the victim during the incident.

Orlandria Shaw testified that the Defendant was her stepbrother. She acknowledged that she had been subpoenaed to testify for the State. Shaw stated that on March 27, 2020, she and her family and some friends planned on going to Old Hickory Lake to have a barbeque because her brother, Tyshawn had been released from jail. That day, Orlandria had driven a blue Kia Optima and made several stops. At one of these stops, she picked up the Defendant. In addition, Naetanya Thompson and Omeka Southerland were also passengers in her vehicle. Orlandria said they all went to the Tiger Mart and later met up with her brother, Quanlando Jones, and Tyshawn Garett. They then followed Jatoria Shaw to the Andrew Jackson Apartments. Jatoria left to pick up her sister from West Tennessee, so the remainder of the group stayed in the area. Orlandria was outside her car when she heard some gunshots and dropped to the ground. Omeka convinced her to get in her vehicle and Naetanya told her to calm down so she could crank her vehicle. Before she drove away, the Defendant also jumped in the backseat of her vehicle.

After watching one of the surveillance videos, Orlandria identified herself, Omeka, and Qualando, and the victim in the video. She recalled noticing the victim walking up and down the street that day because he had his hoodie on. She said she never heard the victim saying anything to anyone or making any ugly faces at anyone and asserted that she never saw the victim with a weapon in his hand. At the time, she was not concerned about the victim having a weapon. Orlandria said the mood on the street that day was "very

chill." She said that when the victim walked by them the second time, she did not notice him doing or saying anything to her group and was not concerned that the victim had a weapon.

While watching this recording, Orlandria stated that she was by her vehicle, and the Defendant was sitting on the brick wall with Tyshawn Garett and Quanlando Jones a short distance away. She said that during this time, she could not hear anything between the victim and her group. Orlandria said she was not worried that the victim was going to hurt her and did not see the victim with a weapon. She said the victim was not making any threats, and she heard no argument between the victim and the Defendant. Although she agreed that the victim had his arm up during the recording, she said she did not hear the victim say anything at that time and heard no argument between the victim and the Defendant or the other members of her group.

After reviewing the recording, Orlandria said it showed Quanlando and Tyshawn driving away in Quanlando's car, a white Camaro, after the shots were fired. She said that right before they drove away, she jumped in her car, tried to crank it, and yelled at Quanlando and Tyshawn to get in their car because she had just heard gunshots. At the time, Orlandria did not know who fired the gunshots. When she got in her car, Omeka Southerland was in the back seat, and Naetanya Thompson was in the passenger seat. After Omeka shut her car door, the Defendant opened the door, got into the back seat, and told Orlandria to "pull off, pull off," although he did not say much else. After leaving the scene, Orlandria drove to her father's home, where she asked what happened, and the Defendant did not say anything. She realized that the victim had been fatally shot a day or two after the incident. Orlandria said that she never talked to the Defendant after she realized what had happened during the shooting. She confirmed that on March 27, 2020, she never saw the victim with a weapon in his hand and never heard the victim make a threat or a threatening gesture.

On cross-examination, Orlandria said she noticed the victim the day of the incident because the victim was wearing his hoodie over his head, which she thought was odd, given the warm temperature outside. She recalled Quanlando remarking on the strangeness of someone wearing a hoodie that day. Orlandria said that she had her back to the entire incident, did not see the Defendant pull out his gun, and did not know that the Defendant even had a gun that day. She said that she could not hear what Tyshawn and the Defendant were talking about on the wall, even though she was near them, because she was having her own conversation with Omeka and Naetanya.

Orlandria said that after the shots were fired, she drove to her father's home and spent ten to fifteen minutes there with the Defendant. She said the Defendant never sat

down, did not speak much, and was "moving around fast[]paced" as if nervous or anxious. Shaw never talked to the Defendant about what happened that day.

Omeka Southerland, the Defendant's stepsister, testified that the State had subpoenaed her to testify at trial. She stated that on March 27, 2020, she had ridden in Orlandria's car with Orlandria, Naetanya, and the Defendant to a Tiger Market gas station, where they met Jatoria Shaw, Omeka's stepsister. She then drove to the Andrew Jackson Apartments, where they waited for Jatoria while she picked up another sibling. While waiting, Omeka said they all talked in Orlandria's car until they heard gunshots. She said she had seen the victim walking down the sidewalk toward the area where the shooting occurred but did not know him. Omeka said that she was not scared of the victim when she saw him and did not see the victim with any weapons at that time. At the time, the Defendant, Tyshawn Garett, and Quanlando Jones were sitting on a brick wall a couple of feet away from Orlandria's car. Omeka said she never heard an argument between the victim and the Defendant, Tyshawn, and Quanlando. After hearing the gunshots, Omeka dropped to the floor of the car and yelled at Orlandria to get in the car and drive away. She did not know where the gunshots were coming from, although she knew they were close by. She said after that, the Defendant jumped in the car, and when everyone asked what happened, the Defendant did not say anything. Then Orlandria drove to her father's home.

On cross-examination, Omeka watched a surveillance video and stated that she saw two people sitting on a brick wall, thought she observed Quanlando Jones moving around behind them, and saw a fourth person across the street. She acknowledged that she was not facing in the direction of the shooting incident and never saw anyone pull out a gun.

Quanlando Jones, the Defendant's brother, testified that he had driven his white Chevy Camaro to the Andrew Jackson Apartments with Tyshawn Garett. They met with Orlandria Shaw, Naetanya Thompson, Omeka Southerland, the Defendant, and Jatoria Shaw outside the complex. Although Quanlando saw the victim that day, he did not know who he was. However, he had not felt threatened by the victim's presence. Quanlando said that he did not hear the victim saying anything to anyone, though he acknowledged he was talking to his girlfriend at the time and that he did not see the victim making any threatening gestures toward anyone.

While Quanlando was talking to his girlfriend, he had been walking around a grassy area away from Tyshawn and the Defendant, who were sitting on a brick wall. Quanlando identified his location and the location of the Defendant and Tyshawn on the video recording. He said he was not worried about his safety until he heard the gunshots. Quanlando said that at the time the shots were fired, he had his head down because he was texting on his phone. Upon hearing the shots, Qualando was "scared," "panicked," and

"did not know what to do." When asked whether he was concerned about his safety or other people's safety, Quanlando stated,

> My sisters could have been hit. My brothers could have been hit. Anything could have been going on. You know, it[']s just not about you. Other people could have been shot. Anything could have happened. A bullet could have [gone] off and hit somebody, grazed—anything could have happened.

Quanlando and his brother, Tyshawn, ran to Quanlando's car, jumped inside, and drove to their father's home. When they got there, Quanlando's sisters were screaming and crying, and the Defendant was "not doing too much talking" and was "pacing back and forth." He did not know what the Defendant had done until he saw the news the next morning. He recalled asking the Defendant why he had shot the victim, and the Defendant refused to respond and walked "back and forth." At the time, Quanlando believed the Defendant was "scared" and "nervous."

Quanlando stated that when the Defendant refused to answer his questions, he told the Defendant, "[I]f they don't find [a weapon] on [the victim], you know, it can't be self-defense." Quanlando reiterated that he did not feel threatened by the victim before the shooting "because it happened to fast." Upon hearing this, the Defendant continued to pace and started "breathing really hard." Finally, the Defendant told Quanlando that he had been "grazed or something like that." However, Quanlando said he never saw any proof that the Defendant had been grazed by a bullet.

On cross-examination, Quanlando said he believed he was wearing headphones when the shooting occurred. He admitted that after the shooting, the Defendant did not behave as he normally did. Quanlando said that the Defendant was "a good boy" and "straightforward," which was why Quanlando was "confused" by the Defendant's behavior.

Naetanya Thompson testified that she had been with Orlandria Shaw, one of her best friends, on the day of the shooting. She recalled seeing the victim walking down the sidewalk at the apartment complex but did not feel threatened by the victim. Naetanya did not observe the victim saying anything to anyone else, making scary gestures, or threatening anyone that day. She acknowledged seeing the Defendant pull out a black gun before she heard the gunshots. She did not know where the Defendant was aiming his gun or why he pulled his gun out. However, Naetanya denied hearing any type of argument or fighting before the shooting started, and she denied hearing the Defendant say anything before he started shooting. She said she was not aware of the Defendant having a gun before he pulled the gun from his pants that day.

On cross-examination, Naetanya stated that she had been farther than six or seven feet from the Defendant at the time of the shooting. She noted that people had been playing music and dancing at the far end of the street, and she admitted she had been paying more attention to those people than the victim and the Defendant before the Defendant took out his gun. Naetanya said that although she did not hear the victim and the Defendant talking, it was possible that they were talking.

On redirect examination, Naetanya said that when the Defendant got into Orlandria's car after the shooting, she yelled for the Defendant to get out. The Defendant refused to get out of the car and said nothing while he rode in the car.

Detective Lynette Mace with the MNPD was accepted as an expert in the field of crime-scene analysis. She stated that she was called to the crime scene in this case on March 27, 2020. The State introduced the photographs Detective Mace had taken as well as her diagram of the crime scene. She confirmed that a knife with a red handle was collected at the scene. After reviewing photograph thirty-two, she admitted that fallen cartridge cases gave a general idea of where the shooter was standing.

Although nine gunshots were heard during the shooting, Detective Mace confirmed that eight nine-millimeter Luger cartridge cases were collected at the scene. She noted that two projectile fragments were collected from the victim's clothes. Detective Mace examined a projectile fragment found on the victim's clothing and determined that the angle of impact on the projectile when it hit the ground was forty-five degrees. She stated the shooter must be "in close proximity" of the victim and "shooting down at a forty-five-degree angle" to create this damage to the projectile. After reviewing her diagram of the scene, Detective Mace said that, prior to the shooting, the Defendant and the victim were standing on rock walls on opposite sides of the street that were approximately forty feet apart.

On cross-examination, Detective Mace acknowledged that a projectile could change its trajectory after it hits a solid object. However, she opined that the projectile with the forty-five-degree angle, which showed substantial impact with concrete, did not deflect off the bone at forty-five degrees at that speed and force.

Detective Myriah Iles testified that she was the lead homicide detective with the MNPD assigned to the case. She recalled that the information about the two cars leaving the scene, which belonged to Orlandria Shaw and Quanlando Jones, had been important leads in the case. After descriptions of these vehicles were put out on the news as vehicles of interest in the victim's shooting, Omeka Southerland and Orlandria Shaw came to talk to her. They identified the individuals who left the scene in both Orlandria's car and Quanlando Jones's white Camero. They told Detective Iles that in Orlandria's blue car,

the Defendant was in the back left, Naetanya was in the front passenger seat, Omeka Southerland was in the back right, and Orlandria Shaw was driving. They also said that Quanlando was driving the white Camero and Tyshawn Garder was riding with him. In addition, they told Detective Iles that most of the people in the blue and white cars were related. During her investigation, Detective Iles discovered that the victim had a friend and a cousin who lived in the Andrew Jackson Apartments. She said the Defendant never reported that he was a victim in an incident on March 27, 2020.

On cross-examination, Detective Iles recalled locating and interviewing Quanlando Jones. After reviewing the interview, she acknowledged that Quanlando stated he had been walking around rather than sitting with the Defendant and Tyshawn Garett on the rock wall. However, Detective Iles admitted that when she took out three search warrants in this case, all three warrants incorrectly stated that Quanlando Jones was sitting with the Defendant on the wall, rather than Tyshawn Garett sitting with the Defendant. Detective Iles admitted that Tyshawn Garett, who was sitting on the wall with the Defendant immediately before the shooting, would have had the best view of the incident. Although she admitted to making this mistake on the three search warrants, she denied that she stopped looking for Tyshawn Garett because of this mistake. She could not recall when she stopped looking for Tyshawn.

Detective Iles admitted that after the first or second gunshot, the victim either ducked or hunched over because he got shot, and by the seventh or eighth gunshot, the victim was lying on the ground. She said that her warrant, which was based on the evidence from the surveillance video, stated that the Defendant stood up, took one shot, and then the victim fell. She admitted her warrant did not say that the victim "begins to fall."

On redirect examination, Detective Iles recalled that on March 31, 2020, she became aware of a police chase involving Tyshawn Garett in Coffee County, where Garett was in a car that eluded police officers. She asserted that because of this incident, she did not believe Garett would be a cooperative witness. She also stated that when she took the warrant out on the Defendant two days later, she continued to feel that Garett would not be a cooperative witness.

Dr. Miguel Laboy, a medical examiner in the state Medical Examiner's Office, was accepted as an expert in forensic pathology. Dr. Laboy, who performed the victim's autopsy, described each of the victim's wounds based on his diagrams and photographs of the victim. He said the victim sustained gunshot wounds to the chest, the front right arm, the back, the right buttock, the left thigh, and two shots to the right leg, all of which were fired from an indeterminate range. He stated that one of the victim's wounds was consistent with somebody who was on the ground and was being shot. Dr. Laboy noted that although the victim had tested positive for benzoylecgonine, an inactive cocaine

metabolite, and cannabinoids from marijuana, the victim was not experiencing the effects of these drugs at the time of his death. Dr. Laboy stated that the victim's cause of death was "[m]ultiple gunshot wounds" and the victim's manner of death was "[h]omicide."

On cross-examination, Dr. Laboy acknowledged that the victim never sustained gunshots to the head or neck area. He agreed that his autopsy report was dated March 30, 2020, and the victim's blood was taken on that date, which was three days after the victim's death. Dr. Laboy agreed that when a bullet goes through a body, it might or might not stay straight.

On redirect examination, Dr. Laboy stated that the victim had three bullets that hit him from the back. He reiterated that his expert medical opinion was that the victim was not under the effects of cocaine at the time he died.

**Defense Proof.** Tyshawn Garett acknowledged that he was currently in the custody of the Davidson County Sheriff's Office for a pending charge and had been incarcerated for the last year and a half. Garett stated that Orlandria Shaw, Omeka Southerland, and Jatoria Shaw were his half-sisters and that Quanlando Jones and the Defendant were his half-brothers. He did not know Naetanya Thompson.

Garett stated that on March 27, 2020, he had just gotten out of jail. He stated that the Defendant was "[h]appy, joyful" and that he never saw the Defendant arguing or fighting with anyone before the incident. Garett recalled seeing the victim walking down the sidewalk wearing a hoodie, which was odd considering the pleasant weather. He claimed the only reason a person would wear a hoodie during warm weather was if he was "on something" or was "plotting" and "trying to do something." Garett said he had never seen the victim before the incident.

Garett stated that before the shooting, he had been sitting next to the Defendant on a brick wall. He noted that based on the video recording, he was sitting on the left, and the Defendant was sitting on the right. Garett said that when the Defendant sat down next to him on the wall, the Defendant did not mention anything about the guy in the hoodie or getting into an argument with anybody. Garett did not believe that the Defendant had been drinking or smoking that day.

At first, Garett did not notice the victim, but he began observing the victim when the victim leaned on the wall across the street. The victim called out to the Defendant, "[H]ey, little Will." The victim then stated, "[B----]h a[--] n[----]a. You don't know me. What's up. Who is y'all. What y'all doing." Garett said he asked the Defendant if he knew the victim, and the Defendant asked Garett the same thing, but neither knew the victim. Garett remembered the Defendant asking the victim, "[D]o you know me[?]" He

said the victim then called out, "[Y]'all b[---]h a[--] n[----]s, what y'all trying to do, a n[----] will do something to y'all." He described the victim's demeanor as "aggressive" and stated that the victim talked fast, and he could not hear every word he said. Garett said that while the victim was making these statements, the victim "reach[ed] in his pants like he's got a weapon." He explained that the victim's hand went "[t]o the side of his waist" and disappeared into his clothing. Garett said that when he saw the victim reach toward his waist, he was afraid and believed his "life [was] in danger" because he thought the victim was pulling out a weapon. Two to three seconds later, the Defendant stood up, told him to get out of the way, and reached like he had a weapon. Garett moved to the right and heard gunshots. Garett admitted that although the victim seemed to be reaching for a weapon, he never actually saw the victim with a weapon that day.

After the shots were fired, Garett ran to Quanlando Jones' vehicle and got into the passenger side. From there, Quanlando's and Orlandria's vehicles drove to the Defendant's mother's home. When they arrived, Garett talked to the Defendant for two or three minutes. Garett described their conversation:

[W]hen [my brother, the Defendant,] came around the corner, I could tell [he] was in a state of mind like he couldn't believe what he just did. So like he . . . broke down mentally, physically, broke down crying. I h[e]ld him. We talked. I told him everything [was] going to be all right, God [was] going to play everything out. It was like he didn't want to do that. He was trying to protect me. I [had] just got[ten] out of jail. He was scared for my life, his life. And we just had like one of them moments like a brother['s] bond.

Garett said that he did not blame the Defendant for what he did to the victim that day. He said that if he had been armed, he also would have fired shots at the victim because he "felt like [his] life was in danger" because he believed the victim was going to pull out a gun and shoot him.

On cross-examination, Garett acknowledged that he refused to speak with the investigator from the district attorney's office who had contacted him before trial regarding his testimony; however, he claimed he had not trusted the investigator or the district attorney's office. He claimed the investigator told him that if he told him everything he knew, the investigator would help Garett with his case. Garett admitted that he had gotten out of jail on March 27, 2020, after serving a three-year sentence for attempted aggravated robbery and theft of property. Garett said that no one else in the group had to kill the victim to leave the scene that day; he acknowledged that the Defendant did not have to kill the victim to leave the scene that day either. Garett could not recall whether he called 9-1-1 on his cell phone when he started feeling threatened by the victim. He denied that the Defendant only carried a gun when he was in "the projects." Instead, he claimed that the

Defendant only carried a gun "for protection" and that the Defendant did not "tote guns all the time twenty-four/seven." He added that the Defendant only carried a gun when he was "in a place or environment that [was] not our place or environment."

Regarding the victim's decision to wear a hoodie that day, Garett said, "[N]ine [times] out of ten, if you're wearing a hoodie with a hood on your head . . . , you've got a weapon. You have a concealed weapon. You're hiding something." He agreed that the victim was saying things loudly and aggressively to them, which caused him and the Defendant to become even more scared of the victim. Garett agreed that other people on the street should have heard the victim's aggressive statements and felt threatened; however, he stated that most people "mind their business" and aren't "in everybody's business."

On redirect examination, Garett reiterated that when the district attorney's investigator attempted to speak with him, the investigator said that if Garett helped the State with the Defendant's case, the State would help Garett with his other case. He explained that he did not trust the district attorney's office or the police because he had many run-ins with them.

Garett stated that there was a difference in pulling up one's pants and reaching for a weapon and that when one pulled up one's pants, the person reaches toward the front of the pants whereas when one reached for a weapon, the person reaches toward the side where the weapon is kept. Garett said that other than the Defendant, he did not see anyone else in his group with a gun. While Garett previously testified that the Defendant did not have to kill the victim, he clarified that this was true in every shooting because the person could throw his gun or simply run away. He stated that it was suspicious for the victim to wear his hood that day because it was not cold enough to wear the hood up.

The Defendant, William Britton, testified on his own behalf. He stated that he lived in Clarksville, Tennessee with his fiancé, who was pregnant with his daughter, and his two-year-old son. He stated that before this incident, he had been employed as a security guard for Kroger and routinely had a gun in his vehicle while working.

The Defendant stated that on March 27, 2020, he and his group had been at the Andrew Jackson apartments for approximately thirty minutes before the shooting occurred. He recalled kissing his fiancé, Mayal Caldwell, before she left with Jatoria Shaw. The Defendant then walked to the brick wall and sat down on it with Tyshawn Garett.

The Defendant said that he had never met the victim before the incident and did not know who he was. He had not noticed the victim in his hoodie before the shooting. The

- 11 -

Defendant agreed that when someone wears a dark hood on their head, he generally assumes that the person might have a gun or be a dangerous person.

The Defendant said that Tyshawn Garett first noticed the victim trying to speak to him and brought it to his attention. He said that although the victim was yelling at him, he did not understand what the victim was saying. The Defendant asked the victim several times who he was and that he did not know him. The victim then called the Defendant a "b[---]h a[--] n[----]", and the Defendant asked the victim what his problem was and then said, "[W]ho are you because I don't know who the f[---] you are." When asked about what the victim was doing in the video recording when he raised his arms, the Defendant said he did not recall the victim doing that. The victim then replied, "[W]hat the f[---] you want to do." The Defendant said the victim then reached for his waistband "like he had a weapon" which made the Defendant pull out his weapon because he was "scared." After the victim told him "what you want to do" and reached for his waistband, the Defendant said he "fear[ed] for his life" and was "afraid [the victim] was going to shoot me or harm me, everybody that was around me." The Defendant explained that the phrase "what you want to do" is "a threat." He said that when someone moves their hands toward their waist, that person tells him that he is going to "do something" to him. The Defendant asserted that he had never fired a weapon at someone before. When asked why the Defendant walked closer to the victim to fire the remaining eight shots if he was afraid, the Defendant replied, "So I can get better aim." The Defendant said that the first shot he fired was "a warning shot" to scare him off, and when the victim continued to act "very aggressive and kept reaching," presumable for a weapon, the Defendant fired the additional shots. The Defendant claimed that if the victim had turned and run away or had held his hands up after the first shot, the Defendant would have stopped shooting. He stated that although he had sixteen rounds in the magazine of his gun, he only shot nine rounds. He stated that he did not shoot the last seven rounds because once the victim hit the ground, he "let go of his waist."

The Defendant said that he ran away after the shooting because he "panicked . . . was scared" because he "had never been in that situation" and "didn't know what to do." The Defendant denied telling Quanlando Jones that he was "grazed" by any bullets during the incident. He admitted that he was never grazed by any bullets that day. He said that he did not remember what happened after the shooting, explaining that he "really tried to forget it" because he had "nightmares about it." The Defendant said he purchased his gun, a nine-millimeter, from another person through a website and that on March 27, 2020, he was twenty-one years old, which meant he was legally allowed to have his gun.

The Defendant stated that although he did not grow up in the projects, he had siblings and an aunt who lived in the projects. He recalled witnessing a drive-by shooting when he was eight years old, wherein a man got his "head blown off," and another man got

- 12 -

shot in the leg by a shotgun as he was running down the street. He stated that that experience was "scary" and made him "cautious." He said that since that experience, he had seen other violent acts there, which is why he was always armed when going to the housing projects.

The Defendant asserted that on March 27, 2020, he and the people with him were in a great mood and were happy because his brother had just gotten out of jail. He was not surprised that the three women with him did not hear or see anything from the victim because "they had their own conversations" and were not in the same location as he and Garett.

The Defendant said he now knew that the person he shot and killed did not have a gun. Although he acknowledged that he never saw the victim's weapon, he felt the victim was reaching for a gun. He admitted he never saw the victim with a knife; however, he said the victim was reaching for something that day and felt he made the correct call at the time in pulling out his gun and firing the shots at the victim.

On cross-examination, the Defendant said he never "made the decision to kill" the victim after thinking about it. The Defendant admitted he fired a warning shot at the victim, and when the victim did not run off and continued to reach for what he thought was a weapon, the Defendant walked across the street and continued to fire at the victim because he "feared for his life." He agreed that he continued to fire shots at the victim until the victim stopped reaching for what he thought was a weapon in the waistband of his pants.

The Defendant acknowledged that he carried a gun for his work as a security guard and for protection, although he never went to any training or courses on gun safety. He admitted that he did not attempt to educate himself on gun safety. He stated that he did not intend to hit the victim with his first shot but did intend to hit the victim with his second shot because the victim was "still continuing to reach for a weapon." He also intended to hit the victim with his third shot because he "thought [the victim] was . . . trying to harm [him]." The Defendant said that it was not a coincidence that seven of the nine shots he fired hit the victim because the victim was "reaching for a weapon." He said that he "didn't mean to kill [the victim]" and fired the shots to prevent the victim from harming him.

The Defendant admitted that his brother Tyshawn Garett, who survived, was able to walk over to a car right before he fired his first shot. However, he maintained that he did have to shoot the victim to live because he did not know whether the victim, who was "very aggressive," had a weapon. He explained that he was "uncomfortable with the way [the victim] talked to [him] and his movement" in reaching for his waistband. The Defendant said he did not call 9-1-1 before the shooting because he was worried the victim was going to harm him. He also stated that he did not call 9-1-1 after the shooting because

- 13 -

he "was scared that the police w[ere] going to shoot [him] and think [he was] armed and dangerous."

The Defendant said that his brother, Quanlando lied about asking him why he had shot the victim. He also said Quanlando lied about claiming the Defendant said he had been grazed by a bullet during the incident. He claimed Quanlando lied about these things because he "fear[ed] for his life" because if he did not "cooperate, something [was] going to happen to him with the other side's family."

The Defendant admitted that he was a rap artist named "Lil Will." He acknowledged producing several music videos that featured songs he either wrote himself or participated in writing. The Defendant asserted that he sold music and did shows, which were a source of his income, and that he had been a rap artist since he was thirteen years old. When asked why he told the jury on direct examination that he was a security guard and omitted the fact that he was a rap artist, the Defendant stated that he had not made any rap music or music videos since the shooting involving the victim.

When asked about the meaning of the lyrics in the song "Three Down Em" that he wrote and performed, the Defendant stated, "It's just a song. It's just words. They don't mean anything." He added, "That don't mean that's how I am. That's how I make money, and that's what this youth want to hear about." The Defendant asserted that the lyric "little N word slumped" from that song was "just lyrics" and "could mean you're asleep" and "could be anything." He also maintained that the words "killer, killer, take a life" in that song was "just a lyric" and that it did not mean anything." The Defendant stated that his movements in the music video, such as putting his hand as if he were holding a gun, was part of a dance "called bobbing" that was "just for video purpose[s] only." The Defendant also asserted that the lyrics "it's a nightmare on bang street, but this ain't no mother f'ing Freddy" was just a song "like Freddy on Nightmare on Elm Street" and that the words did not mean anything. He also said the lyrics "it's a bloody murder scene, it's killing season" referenced a movie called "[K]illing [S]eason" and that the lyrics were "just words" and "just business[,]" and it was "just a song." He added, "You're making it seem like I'm this bad person" and these words were "just music to catch people's attention."

The Defendant acknowledged that he was featured on another song entitled, "Homicide" written by a friend but stated that he did not write that song. He agreed that he performed in the music video for that song and asserted that the guns in that video were "[p]rop guns" and "BB guns."

The Defendant insisted that he did not know who the victim was before the shooting and asserted that he had not been aware of the victim's involvement in a fight with the victim's family member that resulted in the victim's conviction. The Defendant also said

he did not know anything about the victim being involved in a fight in jail that occurred before the incident at issue. He said that he had no knowledge that the victim was prone to fights but asserted that the victim was "very aggressive" in "his words and his body language" in reaching toward his waistband the day of the shooting.

When asked if the victim was simply pulling up his sagging pants rather than reaching for a weapon the day of the shooting, the Defendant asserted that when someone pulls up their pants, they "don't go under [their] shirt"; instead, they "pull [their] belt loop" and "go in the front and pull [their] pants up like [they] put [their] pants on."

The Defendant denied shooting the victim in the back, despite the medical examiner's testimony to that effect. He did not recall shooting the victim in the back and claimed that if the victim's back had been turned to him, he would have stopped shooting. The Defendant asserted that he was in front of the victim as he fired his shots. He also said that the video recording showed that he ran away after the victim fell to the ground. The Defendant said that although the victim's arms were up for a short time before he began firing his shots, this was not the reason he shot him. Instead, he claimed that he shot the victim because the victim's hands were "on his belt reaching for something."

On redirect examination, the Defendant asserted that the guns in his rap videos were "not real" and the lyrics in his songs were "just business" and "just music." He reiterated that he had not intended to kill the victim and that he only wanted to get the victim "to stop reaching" because it looked like he was reaching for a weapon. He added, "I didn't want [the victim] to harm me. I didn't know what he had." He said that once he saw the victim's hands, he stopped shooting and ran away. He asserted that it would have been fine with him if the victim had survived the shooting.

The Defendant denied having a conversation with Quanlando Jones at his mother's home following the shooting. He said that he was "panicking" but did not tell anyone what happened.

Lieutenant Kimberly Spohn with the Davidson County Sheriff's Department testified that on October 27, 2019, she had been employed as a correctional officer. That day, she had responded to a "code red" call that an officer needed assistance at the jail. When she arrived, she saw the victim taken to a holding cell in handcuffs. After viewing a video recording of this jail incident, she noted that the victim walked over to another inmate, they had a verbal altercation, and then the victim assaulted the other inmate. Lieutenant Spohn said the other inmate never touched the victim in this case before the victim physically assaulted him, so it appeared as if the victim's attack on this inmate was unprovoked. Lieutenant Spohn reviewed a second recording of an incident that occurred

- 15 -

at the jail on November 12, 2019, wherein the victim in this case assaulted a different inmate.

Chanel Arnold-Murray, the investigator employed by the defense, testified that she researched the victim's social media presence. She discovered a video of the victim punching another man, who fell to the ground. She could not identify the other men in the video recording.

On cross-examination, Arnold-Murray stated that she got this video from "a handle that was connected to a post" on the victim's Instagram page. She acknowledged that she did not have personal knowledge of the circumstances of what was happening on the video. She agreed that although the video showed the victim and the other man squaring up, she did not know whether the other man confronted the victim first or vice versa.

A deposition of Officer James Thornton, a patrol officer with the Metro Nashville Police Department, was played for the jury. In it, Officer Thornton stated that on April 15, 2019, he observed the victim hit a female in the face on Church Street, which resulted in him charging the victim with domestic assault.

**Rebuttal Proof.** The State called Detective Myriah Iles in rebuttal, who testified that the victim ultimately entered a guilty plea to domestic assault involving his female cousin.

At the conclusion of the trial, the jury convicted the Defendant of the lesser included offense of second-degree murder, and the trial court sentenced him to eighteen years at one hundred percent release eligibility in the Tennessee Department of Correction. Thereafter, the Defendant timely filed a motion for a new trial and an amended motion for a new trial. After the trial court denied these motions, the Defendant timely filed a notice of appeal.

## ARGUMENT

**I.** **Rap Song Lyrics.** The Defendant argues the trial court abused its discretion in allowing the State to cross-examine him regarding the "racially tinged, violent, and homicidal lyrics" from his rap songs, which pre-dated the shooting incident in this case. The Defendant claims that "the detrimental impact" of these lyrics "far outweighed any minimal probative value" they may have had, and he asserts that this error was so prejudicial that it violated his due process right to a fair trial. He also asserts that by failing to give a limiting instruction, the trial court failed to fully and properly instruct the jury regarding how to assess the rap lyrics evidence. The Defendant urges this court to adopt certain balancing factors to determine the admissibility of evidence, like rap lyrics and rap

videos. Finally, he contends that the trial court's error was not harmless because the prosecutor was allowed to emphasize the offending lyrics in her rebuttal closing statement.

In response, the State contends that the Defendant is not entitled to a new trial due to the admission of the Defendant's rap lyrics. First, the State claims the Defendant waived the due process portion of his argument by not raising it in his motion for new trial. See Tenn. R. App. P. 3(e). The State also asserts that the Defendant waived any issue regarding the trial court's failure to provide a limiting instruction by never asking for such an instruction. See State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982); State v. Haynes, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986); see also Tenn. R. App. P. 36(a). Alternatively, the State asserts that the trial court had no obligation to issue a limiting instruction sua sponte because the rap lyrics/video evidence was admitted under Rule 404(a). Third, the State asserts that the trial court acted within its discretion in admitting this evidence because the court implicitly found that the evidence of the Defendant's rap lyrics/videos was more probative than prejudicial, especially considering the trial court's ruling that the rap videos were inadmissible because they were overly prejudicial. The State notes that the jury rejected the prosecutor's argument, namely that the Defendant premeditated the victim's murder because he wrote rap lyrics and sang about death and murder, when it convicted the Defendant of the lesser included offense of second-degree murder. The State also challenges the Defendant's claim that the rap lyrics were propensity evidence, instead arguing that the proof regarding the rap lyrics "went to [the Defendant's] state of mind" and "to impeach [the Defendant's] testimony that he only carried a gun in the projects." In addition, the State claims that there is no need to adopt a new test to determine the admissibility of rap lyrics because the Tennessee Rules of Evidence "already provide the pathway to [the] admissibility of evidence." Lastly, the State asserts that if the trial court erred in allowing the State to cross-examine the Defendant regarding his rap lyrics, this error was harmless because the admission of this evidence did not affect the judgment and did not result in prejudice to the judicial process. We conclude that the trial court abused its discretion in admitting proof regarding the rap lyrics/videos and that this error was not harmless.

Initially, the Defendant asserts that he did not "open the door" to admission of evidence of his rap lyrics/videos, which he claims were "far more prejudicial than probative" and "had nothing to do with his motive, intent, character or credibility." He notes there was no proof regarding when he made these rap songs and videos and no proof showing that these lyrics were relevant to the shooting. He also asserts the trial court failed to make a finding as to whether the prejudicial value of these lyrics outweighed their extremely limited, if any, probative value. He claims the State's cross-examination regarding the rap lyrics was "highly improper" and the lyrics admitted in this case had "no other purpose than to place [him] in a bad light" and "appeal to racial prejudice." State v. Rucker, No. M2014-00742-CCA-R3-CD, 2015 WL 4126756, at *6 (Tenn. Crim. App. July

9, 2015) (concluding that the State committed prosecutorial misconduct during rebuttal closing argument in reciting rap song lyrics, which had been specifically excluded by the trial court during pre-trial motions, from a local rapper that Rucker posted to his social media page where the racial epithets in the lyrics appeared to have "no purpose other than to place the defendant in a bad light, appeal to racial prejudice, and, apparently, suggest the defendant occupied a position superior to that of the co-defendant" and where "[n]o attempt was made by the State to tie the violent and belligerent attitude of the rap lyricist to specific actions of the defendant"); State v. Sharpe, No. M2015-00927-CCA-R3-CD, 2016 WL 6472628, at *6 (Tenn. Crim. App. Nov. 2, 2016) (concluding that the prosecutor's recitation of rap song lyrics from co-defendant Rucker's social media page, which had been specifically excluded by the trial court during pre-trial motions, amounted to plain error entitling defendant Sharpe to reversal of his own conviction and a new trial, despite "the relative strength of the State's case against [Sharpe]," which included Sharpe's "admissions of guilt to various witnesses").

The Defendant additionally claims that because the evidence of his rap lyrics/videos had no factual nexus to the shooting of the victim, "they were propensity evidence pure and simple." See State v. Rodriguez, 254 S.W.3d 361, 377 (Tenn. 2008) (stating that "[t]he harmful effects of propensity evidence that undermine[] a defendant's credibility increase in close cases when the outcome depends on the jury's assessment of the witnesses' credibility"). He argues that admission of these lyrics allowed the State "to stigmatize the [D]efendant as a 'gun-toting killer,' [to] gain a stranglehold on the case, and [to] deprive him of a fair trial." He also asserts that because of the "inevitable racial stereotypes" associated with rap music, the lyrics in this case were "presumptively inadmissible." Reyna Araibi, "Every Rhyme I Write": Rap Music as Evidence in Criminal Trials, 62 Ariz. L. Rev. 805 (Fall 2020). The Defendant suggests that this court adopt the balancing factors used in the Venable or Skinner cases. See People v. Venable, 304 Cal. Rptr. 3d 731, 733, 737 (Cal. Ct. App. 2023) (referencing Evidence Code section 352.2, which states in part that "[i]n any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings"); State v. Skinner, 95 A.3d 236, 247-252 (N.J. 2014) (stating that in order for the defendant's rap lyrics to be admissible, the evidence must be admissible as relevant to a material issue; the evidence must be similar

in kind and reasonably close in time to the offense charged; the evidence must be clear and convincing; and the probative value of the evidence must not be outweighed by its apparent prejudice).

The record shows that during a jury-out hearing before the start of the State's cross-examination of the Defendant at trial, the prosecutor argued that the Defendant, from his opening statement forward, had "made his relationship to guns and why he carries them the center of his defense." She noted the Defendant testified on direct examination that "when he went to the [housing] projects, he carried a gun" because he knew how dangerous it was there, that he had witnessed "robberies" and "drive-bys" in the projects, and that he would carry a gun if he felt "uncomfortable around somebody, but not every[]day" and that it was "just situational." The prosecutor then argued:

> Your Honor, the State has evidence . . . that shows that the Defendant doesn't just carry a gun when he's scared or when it's situational, that this is an event—that killing somebody is something that he's thought a lot about. He is obsessed with guns. He is obsessed with wanting to use them. He's obsessed with murder scenes. And he's so obsessed with them that he writes songs about them[,] and he sings about them.
>
> And I think it's very important for the Jury to be able to see that. For him to put his character at issue the way that he did, especially about his relationship to guns, it's the State's position that it is only fair for the State to be able to show these things.

During the jury-out hearing, the prosecutor played a recording of the Defendant's rap video, wherein the Defendant sang lyrics about the "little N is slumped" and that he "wanted to take a life." After playing more of this rap video, the State asserted that the Defendant was "literally talking about bloody murder scenes, wanting to kill people" and that the Defendant was "leaning down and shooting exactly like he did in this case [.]" The prosecutor asserted that although the Defendant "made it sound, through his opening statement and his testimony, that he's terrified of what might happen in the projects," the rap lyrics and video evidence showed "the Defendant is the person . . . people should be scared of[.]" The prosecutor then played another rap video by the Defendant for a song entitled "Homicide." She argued that although the Defendant's testimony "made it sound like his relationship to guns is only because . . . he was a security guard and for safety," this rap video "directly contradicted [the Defendant's] testimony." After playing some additional rap videos made by the Defendant, the prosecutor asserted:

> [T]he Defendant's testimony would lead the Jury to believe that he's a family man, a father who is a security guard who worked so hard just to protect other

people, that he's terrified from this traumatic event that he had [in his childhood], that he only carries guns for protection because of what he had seen in his environment. He is the environment.

[The Defendant's rap videos] show [the Defendant] is obsessed with carrying guns to commit crimes like car-jackings, . . . to commit murders, to create bloody murder scenes, that it's killing season . . . . And the State is asking to be permitted to let the Jury know who [the Defendant] really is since they're making a decision about what he did and what was in his mind.

Defense counsel then asked that the prosecutor be required to state what this evidence was being offered to prove, because it sounded like the State was offering it for impeachment evidence. The prosecutor replied that she was offering the proof of the music videos to "impeach [the Defendant's] state of mind." She added that the Defendant testified that he shot the victim "because he was so scared[,]" but the State was able to show that the Defendant had "been singing about wanting to create blood murder scenes all of this time," which "contradict[ed] every single thing that [the Defendant] said . . . during his direct examination." She then added, "Your Honor, if this doesn't impeach somebody's state of mind about what they were wanting to do, and their intent and this wasn't self-defense, I don't know what does. He's singing songs about committing murders."

When the trial court asked the prosecutor what rule would allow her to present extrinsic evidence of a person's character for truthfulness or untruthfulness, the prosecutor offered to "wait, and not even cross-examine [the Defendant] with it and call a witness in rebuttal to impeach him" with the evidence of the rap lyrics/videos. The court asked if the State considered these rap songs/videos as specific instances of conduct contrary to the character the Defendant had been portraying, and the prosecutor responded affirmatively. When the trial court asked how Rule 608 allowed extrinsic evidence to be introduced when this rule specifically excluded extrinsic proof, the prosecutor acknowledged that she was limited to cross-examining the Defendant about these lyrics and then being stuck with his answer. The trial court agreed that the State could fully cross-examine the Defendant about these rap songs/videos.

At that point, defense counsel again questioned what rule the prosecutor was relying on to admit the rap lyrics. Regarding the prosecutor's claim that she would use the rap video/lyrics to impeach the Defendant, defense counsel noted that "[t]he fact [the Defendant is] a rapper doesn't impeach the fact that [the Defendant] also says he . . . carries guns in the projects." Defense counsel stated that "[t]he correct type of impeachment would be if he had said I never carry a gun outside the projects" and then the State showed these rap videos with the Defendant carrying a gun.

- 20 -

Defense counsel then asserted:

> I think we also have to . . . account for the fact that this is—I hate the words that are about to come out of my mouth, but I think it's true. This is artistic expression. This junk [is not] real. . . . [I]f this were the case, then what the State's case would be is that [for] every rapper in the history of the world, [the State's] got probable cause to believe that they're going to commit a murder because they all talk about it. That's not probable cause. It has to be more particularized than that.
>
> If [the Defendant] were talking about . . . back in March, I did so and so, okay, you've got something, or . . . [the Defendant] mentioned some thing [sic] about this particular [victim in his lyrics], okay.
>
> . . . I mean, we have to draw a line somewhere . . . . [I]mpeaching somebody has to do with the fact that their credibility is in question, that he's misrepresented himself to the Jury in a way that you shouldn't believe his actual story, you shouldn't believe he was in fear because he lied about this other thing. Well, I don't think he's lied.

The prosecutor countered that any time a defendant takes the stand, he puts his character at issue and asserted that Tennessee Rule of Evidence 404(a)(1) allowed for admission of evidence of the Defendant's rap lyrics/videos. Defense counsel countered that Rule 404(a) was not applicable because the defense had offered no character evidence showing that the Defendant was peaceful, but if it had, the State could introduce evidence to rebut the proof showing the Defendant's peacefulness. When the State insisted that Rule 404(a)(1) applied, defense counsel replied:

> We, the Defense, have to put on evidence that [the State] can then rebut. We have not put that evidence on. Therefore[,] they can't rebut it. Furthermore, I'm not entirely sure this evidence would even rebut that character trait because rappers say stuff all the time, but regardless, we haven't put that evidence on. So [the State] can't rebut it.

Ultimately, the trial court held that it would allow the State to cross-examine the Defendant about the Defendant's rap lyrics and the guns he had in those videos but would not allow the State to introduce the rap videos because "the prejudicial value of the videos themselves far outweigh[s] its probative value." The court said it would also allow the State to show the Defendant's screenshots of the guns he used in the rap videos, although these

photographs would not be published to the jury, and would permit the State to ask the Defendant what he meant by his rap lyrics. The trial court held that Rule 404(a) did not apply to the admission of this evidence and that Rule 608 did not allow for extrinsic evidence of specific instances of conduct.

The jury returned to the courtroom, and during cross-examination, the Defendant admitted to producing several rap videos featuring songs he either wrote himself or participated in writing. The Defendant acknowledged that he sold rap music and did shows, which were a source of income for him. When the prosecutor asked why he told the jury on direct examination that he was a security guard and omitted the fact that he was a rap artist, the Defendant replied that he had not made any rap music or music videos since the victim's shooting.

When the prosecutor asked about the meaning of his lyrics in the song "Three Down Em" that he wrote and performed, the Defendant stated, "It's just a song. It's just words. They don't mean anything." He added, "That don't mean that's how I am. That's how I make money, and that's what this youth want to hear about." The Defendant asserted that the line "little N word slumped" from that song was "just lyrics" and "could mean you're asleep" and "could be anything." He also maintained that his words "killer, killer, take a life" in that song was were "just . . . lyric[s]" and did not mean anything." The Defendant stated that his movements in the rap video, such as putting his hand up as if he were holding a gun, were part of a dance called "bobbing" that was "just for video purpose[s] only." The Defendant also asserted that the lyrics "[I]t's a nightmare on bang street, but this ain't no mother f'ing Freddy" was just a song "like Freddy [from the movie] Nightmare on Elm Street" and that the words did not mean anything. He also said his lyrics "it's a bloody murder scene, it's killing season" referenced a movie called "[K]illing [S]eason" and that the lyrics were "just words" and "just business[,]" and it was "just a song." He told the prosecutor she was "making it seem like I'm this bad person" when his lyrics were "just music to catch people's attention." The Defendant acknowledged that although he was featured on another song entitled "Homicide," he did not write that song. He agreed that he performed in the rap video for that song but asserted that the guns in that video were "[p]rop guns" and "BB guns."

On redirect examination, the Defendant asserted that the guns in his rap videos were "not real" and that the lyrics in his songs were "just business" and "just music." He reiterated that he had not intended to kill the victim and that he only wanted to get the victim "to stop reaching" because it looked like the victim was reaching for a weapon. He added, "I didn't want [the victim] to harm me. I didn't know what he had." The Defendant claimed that once he saw the victim's hands, he stopped shooting at the victim and ran away. He asserted that it would have been fine if the victim had survived the shooting.

During the State's closing argument, the prosecutor discussed the Defendant's claim that he fired his gun in self-defense. The prosecutor argued, "Self-defense is only appropriate if it is immediately necessary." She then asserted:

> Was it immediately necessary for [the Defendant] to murder somebody because he didn't like the name that he was called. . . . As I said before, his brother [Tyshawn Garett] walked away. His brother walked to the car. I'm going over here, and that's what he did. And he was fine. . . . [The Defendant] had to travel [a] distance to get to where [the victim] was. That was not an immediate necessity. Self-defense is kill or be killed, and that's not what happened here. He wasn't even on the same side of the street as [the victim]. It wasn't immediately necessary.

During defense counsel's closing argument, he argued that the Defendant acted in self-defense in response to the victim reaching for a weapon.

Then, during the State's rebuttal closing argument, the prosecutor again referenced the Defendant's rap lyrics:

> In this trial, what you have to do as a Juror is decide what was going on in the Defendant's mind. And we know . . . a couple of things that happened in the Defendant's mind because I asked him about them yesterday. And it's some of the songs that he chose to write, some of the videos that he chose to produce where he's talking about it being killing season, and bloody murder scenes, and downing people and talking about people slumped, talking about killing. He wrote a whole song called Homicide. And I get it. Not every single person who's a rap artist is a murderer even if they rap about things like that, but this Defendant is. And sometimes life imitates art, and sometimes art imitates life.

Thereafter, at the motion for new trial, appellate counsel claimed that he did not understand how the Defendant's rap song lyrics could be "used against him to help convict him of murder as a . . . prior bad act or . . . however you want to characterize it." He added,

> These are songs. This is not [the Defendant] writing on Facebook I'm going to kill Jo Schmo or whatever and then he ends up killing him, or I'm going to kill his family, or clear words that he's [stating] to others that indicate his state of mind. And that's what we're talking about here.

Appellate counsel then argued:

- 23 -

These [songs and videos] are his art.  And there[ are] so many rap songs that I hear in all cultures that have violence in them.  [W]e could think of countless songs, and art and pictures . . . .  And so[,] these are not the kind of things, I suggest, that are the subject of cross[-]examination in the absence of some connection with the deceased in some way.  These are songs.  It's art.  It makes [the Defendant] sound like a monster, which is what the government wanted.

Appellate counsel asserted that the Defendant's rap lyrics did not have probative value and that the "prejudicial value" of these lyrics was "overwhelming."  He noted that the State recited these lyrics not only in the proof but also during its rebuttal closing argument, which appellate courts often consider in determining whether the error is harmless.  He also referenced the prosecutor's statement in closing that "art imitates life and life imitates art" and noted that this was "a terrible thing to say about a man who sings songs like that."  Appellate counsel additionally asserted that the jury knew what the phrase "the little N word" meant and that phrase "cannot be in a trial like this."  He said that there was "nothing" the Defendant said that "opened the door" to this evidence and that the Defendant did not "deserve that" because the rap lyrics/video evidence was "not appropriate, not when it was art."  He asserted that there was no way for the Defendant to "defend against that" and could not "explain it without digging himself deeper, and deeper and deeper."

In response, the State argued at the motion for new trial hearing that the trial court conducted a jury-out hearing regarding this issue, wherein it weighed the prejudicial effect and probative value of these lyrics.  In addition, it noted that the court refused to allow "the videos to be played" and only allowed "some of the lyrics" in "some of the [Defendant's] songs."  The State asserted that the trial court looked at each of these lyrics on a "case by case" basis and conducted a Rule 401 and Rule 403 type of analysis before admitting them.  It added that the Defendant was able to testify that he was a rap artist and that these lyrics were his art, and both parties discussed the Defendant's lyrics during closing arguments.  When the trial court stated that appellate counsel's argument was that these lyrics should never have been admitted, the State replied that the trial court limited the lyrics that the State introduced and then allowed the parties to fully explore the issue.

At the conclusion of the motion for new trial hearing, appellate counsel insisted that the admission of the Defendant's rap lyrics was "of course . . . first aggressor" evidence because "[t]hat was the whole point" of the State offering it.  He stressed that "first aggressor testimony is proof of things that occurred before the parties were ever together" and "[y]ou balance that against the sins of the alleged victim before [he and the Defendant] met on that street corner" pursuant to the trial court's instructions.  Appellate counsel added, "And that's why that jury instruction is given, so the Jury can make a proper

assessment of the sins of the parties before the encounter to decide which of them was the first aggressor." He argued that the Defendant's rap lyrics could have come in as "character" evidence and as "first aggressor" evidence, and the fact that the lyrics could have come in for two different purposes did not eliminate the need for a jury instruction on first aggressor proof "so the Jury can properly assess it in its proper light to see whatever sins the parties got into before the encounter and [the Jury can] understand how it's weighed."

In its order denying the motion for new trial, the trial court held that the probative value of the Defendant's rap lyrics/videos was not substantially outweighed by the danger of unfair prejudice under Tennessee Rule of Evidence 403:

> Being a rap singer, writing rap lyrics, or producing rap lyrics is not evidence that addresses a person's character for peacefulness, truthfulness, or first aggressor tendencies. It is evidence which, if admissible, would generally be governed by Tenn. R. Evid. 403[, w]hich allows relevant evidence to be admitted unless its probative value is substantially outweighed by the danger of unfair prejudice. In this case, where the ultimate issues centered around the [D]efendant's mental state, the exploration of his mental state in writing his song lyrics had some relevancy which was not substantially outweighed by any unfair prejudice. This is borne out by the jury's rejection of the [S]tate's position that the [D]efendant was guilty of first[-]degree murder.

As a preliminary matter, we address the State's claim that the Defendant waived the due process portion of his argument because he failed to raise it in his motion or amended motion for new trial. We note that throughout the Defendant's trial, the parties and the trial court addressed the issue regarding the admission of the Defendant's rap lyrics as an evidentiary issue, not as a constitutional issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Likewise, in the motions for new trial and the corresponding hearing, the Defendant framed the rap lyrics/videos question as an evidentiary, rather than a constitutional issue, and this was also how the trial court considered this issue in its order denying the motion for new trial. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise[,] such issues will be treated as waived."). Appellate jurisdiction "extends to those issues that 'ha[ve] been formulated and passed upon in some inferior tribunal.'" State v. Bristol, 654 S.W.3d 917, 925 (Tenn. 2022) (alteration in original) (quoting Fine v. Lawless, 205 S.W. 124, 124 (Tenn. 1918)); see State v. Dobbins, 754 S.W.2d 637, 641

(Tenn. Crim. App. 1988) ("It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court."); State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) ("[A] defendant may not object to the introduction of evidence on one ground, abandon this ground, and assert a new basis or ground for the objection in this Court.").

Accordingly, we are constrained to conclude that because the Defendant failed to assert at trial and in his motions for new trial that the admission of the rap lyrics/videos violated his due process right to a fair trial, he has waived the constitutional portion of his argument as to the admission of this evidence. See State v. Harbison, 539 S.W.3d 149, 164-65 (Tenn. 2018) (asserting that the contents of a motion for new trial "should direct the attention of the trial court and prevailing party to the asserted error, and the movant should specify the issues with sufficient certainty to enable the appellate court to determine whether the issue was first raised in the trial court") (reiterating that Rules 13(b) and 36(a) authorize appellate courts to give "complete relief to the parties as long as they have been given fair notice and an opportunity to be heard on the dispositive issues" (citation omitted)). Here, because the Defendant failed to make the constitutional argument regarding the admission of the rap lyrics/video evidence at trial and in his motions for new trial, the trial court was unable to consider whether the admission of this evidence violated his constitutional right to a fair trial. Therefore, we will consider this issue in the limited context of the evidentiary question the Defendant properly preserved for appeal.

When a trial court makes an evidentiary ruling, "the appropriate standard of review on direct appeal is whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." State v. McCaleb, 582 S.W.3d 179,185-86 (Tenn. 2019) (citing Regions Bank v. Thomas, 532 S.W.3d 330, 336 (Tenn. 2017); State v. Davis, 466 S.W.3d 49, 61 (Tenn. 2015)); see State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010). As the Tennessee Supreme Court explained:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the [trial court] . . . or to substitute their discretion for the [trial] court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.
>
> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond

the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010) (emphasis added) (citations omitted).

Tennessee Rule of Evidence 404(a) states that, generally, evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion. However, Tennessee Rules of Evidence 404(a)(1) and (2) provide that, in a criminal case, if evidence of a trait of character of the victim is offered by the defendant and admitted under Tennessee Rule of Evidence 404(a)(2), the State may offer "evidence of the same trait of character of the [defendant] . . . ." The 2009 Advisory Commission Comment for this rule explains, "If the accused attacks the character of the alleged victim, amended Rule 404(a)(1) allows the prosecution to prove the accused's character for the same trait. This is an additional way the accused 'opens the door' to character evidence." Tenn. R. Evid. 404, 2009 Advisory Comm'n Cmt. Typically, Rule 404(a)(1) and (2) are used to present proof of the victim's previous history of violence to establish that the victim was the first aggressor. See State v. Ruane, 912 S.W.2d 766, 780-82 (Tenn. Crim. App. 1995), abrogated on other grounds by State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998).

The State may present rebuttal proof of the defendant's character by offering reputation or opinion testimony. Tenn. R. Evid. 405(a); see State v. Taylor, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at *45 (Tenn. Crim. App. Sept. 30, 2014). In addition, a party, after application to the court, may cross-examine witnesses about specific instances of the defendant's conduct after the following conditions are satisfied:

(1) The court upon request must hold a hearing outside the jury's presence,

(2) The court must determine that a reasonable factual basis exists for the inquiry, and

(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Tenn. R. Evid. 405(a).

This court has repeatedly held that once a defendant presents specific acts of violence by the victim to support his claim that the victim was the first aggressor, the defendant has opened the door for the State to present evidence of the defendant's character for violence. See State v. Romero, No. E2015-00860-CCA-R3-CD, 2016 WL 3437166, at *7 (Tenn. Crim. App. June 15, 2016) (concluding that the trial court did not err when it held that the defense's proof regarding the victim's prior acts would "open the door" for the State to offer proof of the defendant's character for violence); State v. Taylor, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at *45 (Tenn. Crim. App. Sept. 30, 2014) (holding that the defendant "opened the door" to the State presenting proof of her character when the defendant offered proof that the victim was the first aggressor and that she had acted in self-defense when she fatally shot the victim); State v. Cobb, No. W2011-02437-CCA-R3-CD, 2013 WL 1223386, at *13 (Tenn. Crim. App. Mar. 26, 2013) (reiterating that if a defendant puts the victim's character for violence at issue, the State may present evidence of the defendant's character for violence to rebut the same pursuant to Rule 404(a)(1)).

At trial, the Defendant, through the testimony of Lieutenant Kimberly Spohn and Chanel Arnold-Murray and the deposition testimony of Officer James Thornton, presented evidence of the victim's prior specific incidents of violence to show that the victim was the first aggressor. The Defendant testified that on the day of the incident the victim kept reaching at his waist for what appeared to be a weapon. The Defendant stated that he believed the victim intended to kill him and that the Defendant fatally shot the victim in self-defense.

The record shows that while the State did not object to the defense's presentation of evidence about the victim's specific incidents of violence against third parties, which the trial court approved during a pre-trial hearing, the State requested that the trial court allow it to cross-examine the Defendant about his rap lyrics/videos to show the Defendant's character for violence. The defense objected, arguing that the Defendant's rap lyrics/videos constituted the Defendant's "artistic expression" and that the events referenced in the lyrics and the videos were not real.

- 28 -

Although the State, in failing to object, did not limit the defense's proof to testimony in the form of reputation or opinion pursuant to the limitation in Rule 405(a), we believe the defense's proof regarding the victim's prior specific acts of violence against third parties still amounted to character evidence under Rule 404(a)(1) and (2). As this court recognized, "'[T]he use of specific acts [of the victim] to prove first aggression is character proof of the victim's propensity for violence.'" Ruane, 912 S.W.2d at 780 (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 404.4 (2d ed. Supp. 1994). We conclude that the defense's extensive proof regarding the victim's prior violent acts against third parties, which the trial court approved prior to trial, constituted evidence of the victim's character for violence and was presented for the purpose of showing that the victim was the first aggressor. Once the trial court approved the defense's intent to present the victim's prior specific acts of violence against third parties to support the theory that the victim was the first aggressor and the Defendant testified that he acted in self-defense, the Defendant arguably "opened the door" to the State presenting proof of the Defendant's character for violence. See Tenn. R. Evid. 404(a).

However, before allowing the State to cross-examine the Defendant about specific instances that depicted the Defendant's propensity for violence, the trial court should have (1) upon request, held a hearing outside the jury's presence, (2) determined that a reasonable factual basis exists for the inquiry, and (3) determined that the probative value of a specific instance of conduct on the character witness's credibility outweighed its prejudicial effect on substantive issues. Tenn. R. Evid. 405(a). Here, the trial court conducted the required jury-out hearing but failed to determine if a reasonable basis existed for the State's inquiry into the Defendant's rap lyrics/videos and failed to determine whether the probative value of the specific instance of conduct on the character witness's credibility outweighed its prejudicial effect on substantive issues. See id. Instead, the trial court held that it would allow the State to cross-examine the Defendant about the Defendant's rap lyrics and the guns the Defendant had in his rap videos but would not allow the State to introduce the Defendant's rap videos themselves because the prejudicial nature of these videos far outweighed the probative value of the videos. Accordingly, we conclude the trial court failed to make the requisite findings required by Rule 405.

Accordingly, we must next consider whether the trial court abused its discretion in allowing the State to cross-examine the Defendant about his rap lyrics/videos. The First Amendment to the United States Constitution protects music "as a form of expression and communication." Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989). However, the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993); see State v. Williams, No. E2019-02236-CCA-R3-CD, 2022 WL 152516, at *20 (Tenn. Crim. App. Jan. 18, 2022). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy,

reliability, and the like." Mitchell, 508 U.S. at 489; see Williams, 2022 WL 152516, at *20.

Courts have repeatedly recognized that the admission of rap lyrics at trial presents "a serious risk of inflaming the jurors and influencing them to convict a defendant on impermissible grounds." United States v. Williams, 663 F. Supp. 3d 1085, 1133 (D. Ariz. 2023) (citing United States v. Gamory, 635 F.3d 480 (11th Cir. 2011); United States v. Bey, No. 16-290, 2017 WL 1547006 (E.D. Pa. Apr. 28, 2017); United States v. Williams, No. 3:13-cr-00764-WHO-1, 2017 WL 4310712 (N.D. Cal. Sept. 28, 2017); State v. Cheeseboro, 552 S.E.2d 300 (S.C. 2002)). First, and most importantly, rap music containing offensive and inflammatory language may prejudice a jury. Montague v. State, 243 A.3d 546, 687 (Md. Ct. App. 2020) ("No matter how easily the State may meet the low relevance threshold when offering a defendant's rap lyrics as evidence, '[t]he admission of [a] defendant's inflammatory rap verses . . . risk[s] poisoning the jury against [the] defendant.'" (quoting Skinner, 95 A.3d at 238)). In addition, often "rap music features fictional imagery, metaphors, and exaggerated storylines." Williams, 663 F. Supp. 3d at 1133; see Hart v. State, 688 S.W.3d 883, 895 (Tex. Crim. App. 2024) ("The danger associated with playing these videos to the jury is that the jury might regard creative expression as proof that Appellant engaged in criminal behavior based upon his rap videos instead of regarding them as nothing more than creative expression."); Bey, 2017 WL 1547006, at *6 (noting that "rap music is a well-recognized musical genre that often utilizes exaggeration, metaphor, and braggadocio for the purpose of artistic expression" and asserting that "[b]ecause rap lyrics may falsely or inaccurately depict real-life events, they should not necessarily be understood as autobiographical statements" (footnote omitted)). We note that "it is difficult to identify the probative value in fictional or other forms of self-expressive endeavors because it cannot be presumed that the author has acted in accordance with the views that he wrote about." Williams, 663 F. Supp. 3d at 1133 (citing Skinner, 95 A.3d at 251).

Courts have also overwhelmingly recognized that the probative value of rap lyrics is greatly diminished "when it is unknown who wrote the lyrics, when the lyrics were written, when the songs were recorded and perhaps edited, and/or when they were uploaded to YouTube or similar social media." Id. (citing Gamory, 635 F.3d at 493; United States v. Stephenson, 550 F. Supp. 3d 1246, 1252-53 (M.D. Fla. 2021)). However, "[r]ap lyrics are more likely to be found probative and admitted at trial when they mirror the charged crime(s) or describe activity that resembles aspects of the central crime(s) alleged." Id. at 1134 (citing United States v. Stuckey, 253 Fed. App'x 468, 482 (6th Cir. 2007); United States v. Wilson, 493 F. Supp. 2d 484, 488-89 (E.D.N.Y. 2006)). As the New Jersey Supreme Court in Skinner recognized:

The difficulty in identifying probative value in fictional or other forms of artistic self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views. One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell-Tale Heart," simply because of their respective artistic endeavors on those subjects.

Skinner, 95 A.3d at 251-52. Similarly, the Texas Court of Criminal Appeals noted:

Holding song lyrics to their literal meaning would lead to the following conclusions: Freddie Mercury "killed a man," Bob Marley "shot the sheriff," Macy Gray "committed murder and . . . got away," the band formerly known as The Dixie Chicks killed Earl, and classically, Johnny Cash "shot a man just to watch him die." These are conclusions we cannot accept outside of some other evidence demonstrating the lyrics are something more than fiction.

Hart, 688 S.W.3d at 894-95 (footnotes omitted) (citations omitted).

We conclude that the probative value of the Defendant's rap lyrics/videos did not outweigh the prejudicial effect of this evidence on the substantive issues. The rap lyrics/video evidence admitted at the Defendant's trial created a substantial danger of unfair prejudice because the highly inflammatory nature of this evidence created a serious risk that the jury would convict the Defendant on improper grounds. See Williams, 663 F. Supp. 3d at 1134-36. In addition, the probative value of the rap lyrics/video evidence is extremely minimal because this evidence did not relate to the Defendant's character for violence. See Hart, 688 S.W.3d at 896.[1]

First, the lyrics/video evidence presented a serious risk of inflaming the jurors and influencing them to convict the Defendant on improper grounds. The Defendant's rap lyrics are highly inflammatory. The lyrics include the use of the N-word and profanity and contain language and imagery of guns, violence, and murder. See Gamory, 635 F.3d at 493 (concluding that the minimal probative value of the rap video was substantially

---

[1] In addition to the aforementioned factors regarding the inflammatory nature of the evidence and the probative value of the evidence, other factors that a trial court may consider when determining the admissibility of "artistic expression" evidence include, but are not limited to, whether this evidence is cumulative to other evidence the State will admit at trial, whether admission of this evidence will unduly delay the trial, whether this evidence was created close in time to the offense, and whether the evidence exhibits an unmistakable connection to the charged offense. See Williams, 663 F. Supp. 3d at 1132-1158.

outweighed by the video's unfair prejudice in part because the lyrics included references to "violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle"); Williams, 663 F. Supp. 3d at 1134 (stating that the rap video and songs were "highly inflammatory" and their admission created a "serious risk of prejudice" because they contained "language and imagery related to drugs, gun crime, violence, and misogyny" and the lyrics were "filled with profanity and use of the N-word"); Williams, 2017 WL 4310712, at *7 (noting that the videos at issue depicted "images of young African-American men, guns, and drugs atop musical lyrics that denigrate other African-Americans, women, and cooperating witnesses," which were "highly inflammatory" and might "arouse an emotional response, evoke a sense of horror, or appeal to an instinct to punish"). Given the inflammatory nature of the Defendant's rap lyrics/videos, we conclude that their admission raised a significant risk that the jury convicted the Defendant of second degree murder on improper grounds.

Second, the probative value of the rap lyrics/video evidence was extremely minimal because this evidence did not relate to the Defendant's character for violence. See Skinner, 95 A.3d at 252 ("[A]bsent such a strong nexus to defendant's charged crime, his fictional expressive writings are not properly evidential."); Commonwealth v. Gray, 978 N.E.2d 543, 560 (Mass. 2012) (concluding that the rap video, which was offered to prove the defendant's gang membership, should have been excluded because "[t]he lyrics show[ed] no connection to the defendant that would suggest they were biographical or otherwise indicative of his own motive or intent at the time of the shooting"). In Hart, the Texas Court of Criminal Appeals emphasized that there must be proof showing that the lyrics are representative of the Defendant's character or are relevant to the charged offense:

"[W]e don't convict people for murder simply because they have written lyrics about murder." Stuckey, 253 F. Appx. at 483. . . . Here, the State did not offer anything demonstrating that the lyrics and video were somehow representative of Appellant's character in that they applied outside of the artistic rendering, nor did they demonstrate that, even if they had some real-world application, it was relevant to the charged offense."

Hart, 688 S.W.3d at 896.

In this case, the evidence of the Defendant's rap lyrics/videos was not relevant to the Defendant's character for violence. The State presented no proof that the Defendant's lyrics/videos described events that were autobiographical. Instead, these lyrics only make general references to violence. See id. at 896 ("Regardless of the genre, inflammatory lyrics create the potential that the jury could ascribe character assessments to the defendant based on the content of the music he listened to or lyrics he wrote."); Cheeseboro, 552 S.E.2d at 313 (concluding that the rap lyrics should not have been admitted because

"[u]nlike [other evidence at trial that] contain[ed] identifying details of the crimes committed, these lyrics contain[ed] only general references glorifying violence"); Bey, 2017 WL 1547006, at *7 (holding that "[g]iven the exaggerations and fabrications scattered throughout Bey's lyrics," the lyrics referencing firearms had "minimal probative value as to his guilt for this [federal] offense [of felon in possession of a firearm]"); United States v. Sneed, No. 3:14 CR 00159, 2016 WL 4191683, at *6 (M.D. Tenn. Aug. 9, 2016) ("The Government's argument has a fatal flaw; rapping about selling drugs does not make it more likely that Defendant Sneed did, in fact, sell drugs."). In addition, there was no proof presented at trial regarding exactly when the Defendant wrote these lyrics, other than the Defendant's testimony that the lyrics generally pre-dated the shooting incident involving the victim. See Bey, 2017 WL 1547006, at *7 (noting that "the probative value of the rap videos and lyrics is further undercut by the fact that they are undated, so there is no indication as to whether Bey created the lyrics close in time to the date of his arrest"). Lastly, we conclude that the Defendant's rap lyrics were not probative of the Defendant's character for violence because the State presented no corroborating proof that the Defendant was a violent person. See Hart, 688 S.W.3d at 896 (noting that the rap video was "not relevant to Appellant's character, since there was no evidence outside of the lyrics themselves corroborating that Appellant was a violent or unfriendly person"). We note that the "the probative value of rap lyrics is low when they contain only general or vague references to violence rather than evidence of specific charged crimes." Williams, 663 F. Supp. 3d at 1145. Because the evidence of the lyrics/videos at issue in the Defendant's case neatly fall into the category of "general or vague references to violence" and the State presented no corroborating proof that the Defendant was violent, the probative value of this evidence is extremely low. Because of the inflammatory nature of this evidence and the extremely low probative value of this evidence, we conclude that the trial court abused its discretion in allowing the State to cross-examine the Defendant about his rap lyrics and videos.

Consequently, we must next determine whether the trial court's error regarding this evidence was harmless. Here, the ultimate factual issue was whether the Defendant fatally shot the victim in self-defense. While most of the people with the Defendant had only very limited observations of the events leading up to the shooting and of the shooting itself, the Defendant and Tyshawn Garett provided the bulk of the evidence surrounding the shooting incident. As we previously noted, because the trial court's error in admitting the proof of the Defendant's rap lyrics/videos was an evidentiary issue rather than a constitutional one, the Defendant had the burden of demonstrating "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)); see State v. Martin, 964 S.W.2d 564, 568 (Tenn. 1998).

The State, during its rebuttal closing, argued that the Defendant's rap lyrics/video evidence provided insight into the Defendant's "state of mind" at the time of the shooting in this case. Although the jury should have only considered the rap lyrics to determine the Defendant's credibility regarding his self-defense claim, the jury could have interpreted the State's rebuttal argument to mean that the jury needed to consider the rap lyrics/video evidence as substantive evidence that the Defendant had the mens rea required to commit the charged offense of premeditated first degree murder or any lesser included offenses, including his conviction offense of second degree murder. Because the State made this argument during its rebuttal closing, the Defendant had no opportunity to respond to it. See State v. Jackson, 444 S.W.3d 554, 592 (Tenn. 2014) (noting that "the impermissible comment [by the State] came at a critically important juncture in the trial—the prosecution's final, rebuttal argument to the jury" because "[t]he defense had no opportunity to respond to the argument."). Moreover, as we will discuss below, the trial court failed to instruct the jury on the "first aggressor proof" in conjunction with the instruction regarding self-defense, thereby precluding the jury from hearing that it could only consider the rap lyrics for the purpose of determining the Defendant's credibility for his self-defense claim and not as substantive proof of the Defendant's mens rea. After considering the entire record, we conclude that the admission of the evidence regarding the Defendant's rap lyrics/videos was not harmless because it "more probably than not affected the judgment" and "would result in prejudice to the judicial process." See Rodriguez, 254 S.W.3d at 372. Accordingly, we reverse the Defendant's conviction for second degree murder and remand the case to the trial court for a new trial.

**II.** **Jury Instructions.** The Defendant argues that the trial court erred in its instructions to the jury. Specifically, he claims the court erred in failing to provide the "defense of others" instruction in Code section 39-11-612, in failing to charge the jury with the critical distinction between second-degree murder and manslaughter within the second-degree murder charge, in failing to instruct on the definition of "unlawful" in the definitions of second-degree murder and manslaughter, in failing to instruct on the "first aggressor testimony proof" in conjunction with the instruction regarding self-defense, in failing to instruct that self-defense applies not only to the charged offense but also to the lesser included offenses, and in failing to instruct on Code section 39-11-201(a)(3) regarding the State's burden to negate self-defense within the definition of the charged offense and the lesser included offenses of second-degree murder and voluntary manslaughter.

A criminal defendant has "'a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial.'" State v. Cole-Pugh, 588 S.W.3d 254, 260 (Tenn. 2019) (quoting Cauthern v. State, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004)). "In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request." State v. Benson, 600 S.W.3d 896,

902 (Tenn. 2020) (citing State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013)). "This obligation extends to general defenses, such as self-defense, defense of another, or defense of a habitation." Hawkins, 406 S.W.3d at 129 (footnote omitted). "'[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge.'" State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)).

"Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 452 S.W.3d 268, 295 (Tenn. 2014). The omission of an essential element from a jury charge is subject to harmless error analysis. State v. Majors, 318 S.W.3d 850, 864 (Tenn. 2010) (citing State v. Garrison, 40 S.W.3d 426, 434 (Tenn. 2000)). An instruction is "'prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Perrier, 536 S.W.3d 388, 403 (Tenn. 2017) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)).

**A.      Failure to Instruct on "Defense of Others."**  The Defendant contends that the trial court failed to instruct the jury on the "defense of another" in Code section 39-11-612, thereby denying him the right to a trial by jury and the due process right to present a full defense. He asserts that this instruction should have been given in the absence of a special request because there was "abundant proof" at trial "of potential harm to others." The State insists that the Defendant did not request a jury instruction on the "defense of another" and that the trial court properly determined that the "defense of another" instruction was not fairly raised by the proof. The State notes that the Defendant's testimony focused on his fear for himself and that the Defendant never testified that he shot the victim in the defense of his brother, Tyshawn Garett. We conclude that the Defendant was not required to file a written request for this instruction because a fundamental defense was involved. State v. Rowlett, No. M2011-00485-CCA-R3-CD, 2013 WL 749502, at *23 (Tenn. Crim. App. Feb. 26, 2013) (stating that Tenn. R. Crim. P. 30(a) does not apply when a fundamental defense is involved); State v. Currin, No. 02C01-9201-CC-00018, 1992 WL 205276, at *3 (Tenn. Crim. App. Aug. 26, 1992) (concluding that a request for an instruction on a fundamental defense, like self-defense, is not required to be made in writing). However, we also conclude that the "defense of another" instruction was not fairly raised by the evidence in this case.

A trial court need not submit "[t]he issue of the existence of a defense . . . to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c); Benson, 600 S.W.3d at 904; Hawkins, 406 S.W.3d at 129. However, "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable." Tenn. Code Ann. § 39-11-203, Sentencing Comm'n Cmts. The Tennessee Supreme Court held that self-defense is a "general defense" and that "the quantum of proof necessary to fairly raise a general

defense is less than that required to establish a proposition by a preponderance of the evidence." Hawkins, 406 S.W.3d at 129; see Perrier, 536 S.W.3d at 403. "When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." Benson, 600 S.W.3d at 903 (citing Hawkins, 406 S.W.3d at 129). When admissible evidence fairly raises a general defense, the trial court must submit the general defense to the jury, and at that point the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply. Hawkins, 406 S.W.3d at 129; see Perrier, 536 S.W.3d at 403. If a defense instruction is submitted to the jury, "the court shall instruct the jury that any reasonable doubt on the issue requires the defendant to be acquitted." Tenn. Code Ann. § 39-11-203(d).

"Defense of another" is defined as follows:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612. As used in this statute, a person's reasonable belief means "the defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified." State v. Bult, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). In other words, "the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." Id.

"The application of the right to defend another should be 'determined in the same fashion as the right of self-defense' under [Code section] 39-11-611." Hawkins, 406 S.W.3d at 128 (quoting Tenn. Code Ann. § 39-11-612, Sentencing Comm'n Cmts.). "A person's right to defend a third party is no greater than the third party's right to defend himself or herself." Id. at 128-29.

At the motion for new trial hearing, appellate counsel argued that the proof in support of the defense of others instruction was "overwhelming." He said the Defendant testified that his brother Tyshawn Garett was sitting next to him and that the Defendant believed the victim "would harm him and everybody around him[.]" In addition, appellate

counsel noted that Tyshawn testified that he was "in fear" and "in danger himself" from the actions of the victim and that there was no proof that Tyshawn was armed or had any way of defending himself. While acknowledging that the defense did not make a special request for the defense of others instruction, appellate counsel argued that under State v. Nevens, No. M2000-00815-CCA-R3-CD, 2001 WL 430602, at *6 (Tenn. Crim. App. 2001), the State had to prove beyond a reasonable doubt that it was harmless not to provide the "defense of another" instruction. He also asserted that when the defense of another instruction is considered in tandem with the fact that the Defendant was convicted of second-degree murder, the State cannot show that the failure to charge the "defense of others" instruction was harmless beyond a reasonable doubt. The State countered that the jury rejected the Defendant's claim that he acted in self-defense, that the proof at trial did not rise to the level of providing a "defense of others" instruction, and that even if it had, Tyshawn Garett was sitting so close to the Defendant that "it really could be considered the same thing."

In the order denying the motion for new trial, the trial court recognized that it was a "close question" whether the "defense of another" was fairly raised by the evidence. It noted that the Defendant, as an "afterthought," testified that he was "afraid [the victim] was going to shoot or harm [him] and everyone that was around [him]." However, the court noted that it was "clear throughout the [D]efendant's testimony that the interactions leading up to the shooting were directly between the victim and the [D]efendant without regard to [Tyshawn Garett] or anyone else." The court observed that although Tyshawn "testified to the fear he was experiencing," there was "no evidence the [D]efendant was aware of [Tyshawn's] state of mind or that it was a factor in the [D]efendant['s] decision to begin shooting the victim." Ultimately, the trial court held that the "defense of another" instruction was not supported by the evidence and that even if its omission was error, it was harmless because "the overwhelming evidence focused on a purported conflict between the [D]efendant and the victim, not a third party." The trial court noted that the jury "rejected self-defense" and that it was "satisfied" the jury "would have rejected defense of another."

At trial, Tyshawn Garett testified that initially the victim seemed to be talking to both the Defendant and him. When the victim reached into his pants like he had a weapon, Tyshawn said he was afraid and thought his "life [was] in danger." He said that two to three seconds later, the Defendant stood up, told Tyshawn to get out of the way, and reached like the Defendant had a weapon. Tyshawn moved to the right and heard gunshots being fired. After the shots were fired, Tyshawn ran to Quanlando Jones's vehicle. The Defendant testified that the victim yelled at him and called him a name before the victim reached for his waistband like he had a weapon, which made the Defendant pull out his weapon because he was "scared." The Defendant said he "fear[ed] for his life" and was "afraid [the victim] was going to shoot me or harm me, [and] everybody that was around

- 37 -

me." The Defendant said that he "didn't mean to kill [the victim]" and that he fired the shots to protect the victim from harming him. The Defendant acknowledged that Tyshawn was able to get to Qualando's car before he fired his first shot. On redirect examination, the Defendant stated that he shot the victim because he "didn't want the victim to harm me" and that he "didn't know what [the victim] had."

We must consider whether the proof in this case fairly raised the possibility that the Defendant shot the victim because he believed doing so was "immediately necessary" to protect a third person. While the evidence, viewed in the light most favorable to the Defendant, fairly raised the possibility that the Defendant acted to protect himself when he fired the shots at the victim, the evidence did not fairly raise the possibility that the Defendant's use of force was "immediately necessary" to protect Tyshawn Garett. Significantly, the Defendant never testified that he shot at the victim to specifically protect Tyshawn Garett. See Hawkins, 406 S.W.3d at 130 (concluding that "[t]he alpha and omega of [the defendant's] defense was his own testimony that he shot [the victim] in a moment of fear to protect himself"). Moreover, the proof showed that Tyshawn was able to easily make it to Quanlando's car by the time the shots were fired, which also weighs against providing the "defense of another" instruction. See Bult, 989 S.W.2d at 733 (observing that the evidence, which established that the defendant kicked at a bedroom door after his daughter's mother or grandmother took her forcibly from the kitchen to the bedroom where his daughter was crying and upset, did not fairly raise the "defense of another"). Lastly, we agree with the trial court that although Tyshawn Garett testified that he was afraid when the victim seemed to reach for a weapon, there was no proof that the Defendant knew that Tyshawn was afraid or that Tyshawn's fear was a factor in the Defendant's decision to shoot the victim. Accordingly, we conclude that the Defendant was not entitled to the "defense of another" instruction.

**B.     Failure to Include Distinction between Second-Degree Murder and Manslaughter.** The Defendant also asserts that the trial court failed to charge the jury with the critical distinction between second-degree murder and manslaughter within the charge for second-degree murder, which violated his right to a fair trial and due process. The State, while admitting that the trial court omitted this distinction in the second-degree murder charge, nevertheless claims this error was harmless. It asserts that this court has repeatedly upheld cases in which the trial court omitted the distinction from the second-degree murder charge but included it in the voluntary manslaughter instruction. We agree with the State.

Specifically, the Defendant asserts that the following language from the pattern jury instruction for second-degree murder was omitted:

- 38 -

The distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from the state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05(a) (September 2023).

Although the Defendant acknowledges that the trial court included the aforementioned language within the voluntary manslaughter charge, he argues that the omission of this language from the second-degree murder charge at the moment the jury was considering whether he was guilty of second-degree murder amounts to reversible error. He claims that because of the "acquittal-first" rule in Tennessee, the jury was required to initially deliberate on second-degree murder, and because the jury found him guilty of second-degree murder, the jury "never got to" or "reached" voluntary manslaughter offense because the quoted language was never included in the instruction for second-degree murder. See State v. Davis, 266 S.W.3d 896, 904-05 (Tenn. 2008). The Defendant claims this error denied him the right to a jury trial under Tennessee law and denied him the right to due process because he received an unfair trial. See State v. Zimmerman, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991) ("There is, however, a thin line between second degree murder and voluntary manslaughter.").

When reviewing challenged jury instructions, this court must view the instruction in the context of the charge as a whole in determining whether prejudicial error has been committed requiring reversal. State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008); State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). When "the instruction alone infected the entire trial and resulted in a conviction that violates due process," see State v. James, 315 S.W.3d 440, 446 (Tenn. 2010), or "when the judge's charge, taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law," see Majors, 318 S.W.3d at 864-65, the instruction is prejudicially erroneous. Clark, 452 S.W.3d at 295.

During a jury-out hearing immediately before closing arguments, defense counsel questioned that if the jury was "working [its] way down" from the charged offense to the lesser included offenses and determined that the Defendant acted knowingly and unlawfully in killing the victim, how would the jury "get past" second-degree murder "to get to voluntary manslaughter, which has that additional element." The trial court replied, "[T]he Supreme Court . . . specifically set out in one of their opinions how [the court is] to charge lesser included offenses of first-degree murder" and "put in the exact language" the court was to use. The court added that with voluntary manslaughter, the accused is still acting "knowingly or intentionally" but is "doing so as a result of some excitement or passion created by the conduct of the deceased." The court said that because the Supreme

Court made it "very clear" about how to charge "premediated murder and all lesser included offenses," it was "not about to overrule" it."

At the motion for new trial hearing, appellate counsel argued the jury should have been instructed on the distinction between voluntary manslaughter and second-degree murder at the time the jury considered the second-degree murder charge. He noted that defense counsel argued at trial that the jury would never get to voluntary manslaughter if the distinction between voluntary manslaughter and second-degree murder was not given at the time the second-degree murder instruction was provided because of the acquittal first rule. Quoting Zimmerman, appellate counsel reiterated that there was "a very thin line between manslaughter and second-degree murder," and consequently, the error in failing to include the distinction in the second-degree murder charge was not harmless error beyond a reasonable doubt. In response, the State argued that the trial court provided the pattern jury instructions, which included this distinction, and that while this distinction came later in the instructions, the trial court instructed the jury to consider all the instructions in harmony with one another, and the jury heard the distinction between second-degree murder and voluntary manslaughter.

In its order denying the motion for new trial, the trial court acknowledged that it did not charge the jury on the distinction between second-degree murder and voluntary manslaughter as part of the second-degree murder charge. However, it asserted that it charged this distinction in the voluntary manslaughter charge. The court also observed that although this issue has been raised in several appellate decisions, no court has found the omission of the distinction between second-degree murder and voluntary manslaughter in the second-degree murder charge to be a "per se reversible error." Ultimately, the court found this error harmless for several reasons. First, the court determined that "the sequential deliberation process did not preclude a discussion of the lesser included offenses while deliberating on a greater offense." The court noted that a jury "seldom discussed issues of importance with blinders on or in a vacuum," particularly in this case where the Defendant had argued that he shot the victim in self-defense. It asserted that the sequential deliberation process only prevents the jury from "deliberating or rendering a verdict on a lesser included offense before the 'aquittal first' offen[s]es requirement is met." Second, the trial court asserted that it read the complete jury charge in open court and each juror had a copy of the complete charge to use during deliberations. The court thought it "unlikely" that the jury was "unaware of the distinction between the two offenses" or that the jury "ignored" this distinction. Third, the trial court found the jury instructions told the jury to "carefully consider all" the instructions and cautioned the jury against "singl[ing] out one or more of them to the exclusion of another or others but should consider each one in light of and in harmony with the others." The trial court reiterated that the "jury is presumed to follow the court's instruction." In conclusion, the trial court held that this error was harmless because there was "significant evidence supporting the jury's verdict."

We note that while the jury instructions given in the Defendant's case did not substantially follow the current pattern jury instructions, these instructions were consistent with the instructions outlined in State v. Page, 81 S.W.3d 781, 790-93 (Tenn. Crim. App. 2002) (appendix), and substantively followed the 2001 version of the pattern jury instructions, which placed the distinction between second-degree murder and voluntary manslaughter behind the voluntary manslaughter charge. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05, 7.06, and 41.01 (6th ed. 2001). This court has consistently upheld sequential jury instructions placing the distinction between second-degree murder and voluntary manslaughter after the voluntary manslaughter charge, and the Tennessee Supreme Court has repeatedly denied permission to appeal on this issue. See State v. Langston, No. W2015-02359-CCA-R3-CD, 2017 WL 1968827, at *15-16 (Tenn. Crim. App. May 12, 2017), perm. app. denied (Tenn. Sept. 22, 2017); State v. Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *16 (Tenn. Crim. App. Mar. 9, 2011), perm. app. denied (Tenn. Aug. 25, 2011); State v. Hines, No. W2009-00450-CCA-R3-CD, 2010 WL 4286132, at *10 (Tenn. Crim. App. Oct. 27, 2010), perm. app. denied (Tenn. Apr. 14, 2011); State v. Welch, No. E2005-02293-CCA-R3-CD, 2006 WL 2737830, at *14 (Tenn. Crim. App. Sept. 26, 2006), perm. app. denied (Tenn. Feb. 26, 2007). Specifically, this court concluded that there is no error when "'prior to their deliberation, the jury . . . was fully and accurately instructed concerning provocation, passion, and the difference between second[-]degree murder and voluntary manslaughter.'" Jones, 2011 WL 856375, at *16 (quoting Welch, 2006 WL 2737830, at *14). However, in upholding these instructions, this court concluded that "the better practice is to adhere to the approach in the Tennessee Pattern Jury Instruction which provides the distinction between second[-]degree murder and voluntary manslaughter in the instruction for second[-]degree murder." Id.; see Hines, 2010 WL 4286132, at *10; Welch, 2006 WL 2737830, at *14; Humphrey, 2005 WL 2043778, at *14-15 (Tipton, J., concurring).

Accordingly, we are constrained to conclude that the jury instructions in the Defendant's case were not prejudicially erroneous. Nevertheless, we strongly recommend that all trial courts use the current version of the applicable pattern jury instructions, which places the distinction between second-degree murder and voluntary manslaughter in the instructions for both offenses. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05(a), 7.06, and 41.01 (2024). Because the trial court included the distinction only one time after the voluntary manslaughter charge, the jury was not clearly advised of the voluntary manslaughter offense at the moment it was considering the second-degree murder offense. While the instructions given in this case, which essentially followed an outdated 2001 version of the Tennessee Pattern Jury Instructions, did not rise to the level of being prejudicially erroneous, they also fell short of being the best instructions available for these offenses.

- 41 -

**C.      Failure to Instruct on the Definition of "Unlawful" in the Definitions of Second-Degree Murder and Manslaughter.**  The Defendant argues that the trial court erred in failing to instruct the jury regarding the definition of "unlawful" in the definitions of second-degree murder and voluntary manslaughter because self-defense makes a killing lawful.  The State counters that the trial court was not required to provide the definition of "unlawful" in the jury instructions.  We conclude that the Defendant waived this issue by failing to request a special instruction defining "unlawful" in the charges for second-degree murder and voluntary manslaughter.

The Defendant notes that killings in Tennessee are only illegal if done "unlawfully" and that pursuant to Code section 39-13-201, "criminal homicide is the unlawful killing of another person, which may be first-degree murder, second-degree murder, voluntary manslaughter, criminally negligent homicide, or vehicular homicide."   The Defendant insists that under Tennessee law, "unlawful" means "without legal justification," State v. Hollon, 671 S.W.3d 561, 567 (Tenn. Crim. App. 2023), and that "without legal justification" is directly related to self-defense, which is a justification defense in Tennessee.  The Defendant claims that because he shot the victim in self-defense, the jury should have been instructed on the technical definition of "unlawful."  See Poole v. State, 61 Tenn. 288, 294 (1872); McCoy v. State, 466 S.W.2d 540, 542-43 (Tenn. Crim. App. 1971).

At the motion for new trial hearing, appellate counsel argued that because second-degree murder and voluntary manslaughter required unlawful killings, the jury should have been instructed that the definition of "unlawful" is "without legal justification, i.e., self-defense or defense of another."  The State responded that the trial court did instruct the jury that "if somebody is acting in self-defense, it is lawful."  It added that "[t]he Jury was apprised that [it] could only find the Defendant guilty if the State proved that self-defense did not apply" and argued that "whether or not the actual word unlawful was instructed did not hamper the Jury in reaching a correct verdict."

In its order denying the motion for new trial, the trial court noted that "[t]he definition of 'unlawful' is not in the criminal code or in the Tennessee Pattern Jury Instruction."  However, it asserted that the jury "was instructed that the [D]efendant could not be guilty of homicide if the State did not prove beyond a reasonable doubt that the killing was not in self-defense."  It also concluded that the Defendant had waived this issue because the defense never asked the trial court to define "unlawful" in the jury charge and never proposed a definition with which to charge the jury.

Regarding the Defendant's claim that the jury should have been instructed that the definition of unlawful is "without legal justification, i.e., self-defense or defense of another" we note that the Defendant never requested this special instruction in writing and,

therefore, has waived this issue. See Tenn. R. Crim. P. 30(a); State v. Leath, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013) (concluding that the defendant's failure to make a written request for a special jury instruction on her "theory of defense" resulted in waiver of plenary review); State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (reiterating that Rule 30(a) "envisions that such requests be made in writing" and that because the Defendant failed to make the request for a special instruction in writing, the trial court did not err in declining to provide the special instruction on intoxication). Moreover, the Defendant failed to request plain error review on this issue, and we decline to conduct such a review. The Defendant is not entitled to relief on this issue.

**D. Failure to Instruct on "First Aggressor Testimony Proof" in Conjunction with the Instruction Regarding Self-Defense.** The Defendant also asserts that the trial court failed to instruct on the "first aggressor testimony proof" in conjunction with the instruction regarding self-defense. In response, the State contends that because the proof at trial did not fairly raise the issue that the victim was the first aggressor, the trial court was not required to give a jury instruction on first aggressor proof. Specifically, the State claims that although the Defendant introduced proof that the victim had previously assaulted other individuals, there was no evidence that the victim was the first aggressor in this case. We have already concluded that it was reversible error for the trial court to admit evidence of the Defendant's rap lyrics/videos at trial. In the event of further appellate review, we also conclude that because the trial court admitted the Defendant's rap lyrics/video proof at trial, the court should have provided the portion of the pattern jury instruction regarding first aggressor proof.

The Defendant claims that because the law about "first aggressor" proof is "not just a rule of evidence but is also a rule about how the jury is to consider this evidence," the trial court should have instructed the jury as follows regarding first aggressor proof as it relates to self-defense:

> As an exception to rule regarding known prior act of violence by the deceased, specific violent acts of the victim against third persons—even if unknown to the defendant—may be considered by you to determine who was the first aggressor and to corroborate the defendant's assertion that the victim was the aggressor.

> If proof was offered by the defendant of a trait of character of the deceased to show that the deceased was the first aggressor, and proof was then offered by the State of a trait of character of the defendant to show that the defendant was the first aggressor, such proof offered by the State for that purpose can only be considered by you for the purpose of its effect, if any, in rebutting the defense proof that the deceased was the first aggressor and that

- 43 -

therefore the defendant acted in self-defense. It cannot be considered by you as evidence of his predisposition to commit the offense for which he is now on trial.

Cf. 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06 Defense: Self-Defense.

The Defendant reiterates that the State was allowed to offer proof of his irrelevant rap song lyrics, from which the jury could have concluded that the Defendant was "some sort of violent man." He claims that the aforementioned limiting instruction, which is based on the pattern instruction for self-defense, should have been given "to mitigate the 'rap song' evidence" by making it clear that this evidence could not be considered as evidence of the Defendant's "predisposition to commit the offense for which he is now on trial." He also asserts that there was proof from the Defendant and Tyshawn Garett that they believed the victim was reaching for a gun before the Defendant began shooting, which made the first aggressor issue a jury question.

At the motion for new trial hearing, appellate counsel contended that the trial court committed constitutional error in failing to include the first aggressor language from the pattern jury instruction because the jury was never told it could not consider the Defendant's rap lyrics/videos as evidence of the Defendant's predisposition to commit acts for which he was on trial. The State responded that while appellate counsel claimed that the rap lyrics were introduced to combat the evidence regarding the violent acts of the victim, the State actually introduced this proof to show the Defendant's "character in general" and the Defendant's "state of mind" and not to rebut proof that the victim was the first aggressor for the purpose of the Defendant's self-defense claim. It continued:

So where [appellate counsel] says that the Jury should have been instructed if proof was offered by the Defendant of a trait of a character of the deceased to show that the deceased was the first aggressor and proof was then offered by the State . . . of a trait of character of the Defendant to show that the Defendant was the first aggressor, that didn't happen. So since that didn't happen, that did not need to be instructed. The State's proof that the Defendant was the first aggressor was the video[,] . . . which showed that the victim was standing clear across the street when the Defendant chose to start shooting at him, walk[ed] across the street and sh[ot] at him even when the victim was l[ying] on the ground in a certain position.

The State then claimed that the first aggressor language did not need to be instructed because it "would have limited . . . how the [j]ury considered the first aggressor evidence" and then asserted incorrectly that the "lack of the instruction actually benefitted the Defendant." It said it argued at trial that the video proof of the incident and the testimony

from the medical examiner showed the Defendant was the first aggressor and that "limiting instruction would have limited . . . how the Jury would have seen the evidence that was offered by the Defendant [of the victim's aggressive tendencies."

In its order denying the motion for new trial, the trial court acknowledged that it did not instruct the jury on "first aggressor" proof but claimed that the proof at trial did not warrant such an instruction. Specifically, the court erroneously maintained that the State never offered proof suggesting that the Defendant was the first aggressor:

> Although ample proof was offered by the defense in support of the victim being the first aggressor, the state did not offer a trait of character suggesting the [D]efendant was the first aggressor. Presumabl[y], the [D]efendant is relying on the court allowing the state to cross-examine the [D]efendant on the lyrics he wrote for several rap songs referencing killings, killing season, bloody murder scenes and other references to street violence[; however,] the prosecution did not argue or otherwise imply that these lyrics were suggestive of the [D]efendant being the first aggressor. Instead, the prosecution briefly referenced this testimony to support its contention that the homicide was a premeditated, intentional killing.
>
> Being a rap singer, writing rap lyrics, or producing rap lyrics is not evidence that addresses a person's character for peacefulness, truthfulness, or first aggressor tendencies. It is evidence which, if admissible, would generally be governed by Tenn. R. Evid. 403[, w]hich allows relevant evidence to be admitted unless its probative value is substantially outweighed by the danger of unfair prejudice. In this case, where the ultimate issues centered around the [D]efendant's mental state, the exploration of his mental state in writing his song lyrics had some relevancy which was not substantially outweighed by any unfair prejudice. This is borne out by the jury's rejection of the [S]tate's position that the [D]efendant was guilty of first degree murder.

In the first section of this opinion, we concluded that the trial court committed reversible error in admitting evidence of the Defendant's rap lyrics/videos as proof of the Defendant's character for violence. In the event of further appellate review, we also conclude that because the trial court admitted the Defendant's rap lyrics/video proof at trial, the court should have provided the portion of the pattern jury instruction regarding first aggressor proof. This would have ensured that the jury knew it could only consider the State's proof regarding the Defendant's rap lyrics/videos for the purpose of rebutting the defense proof that the victim was the first aggressor and not as proof of the Defendant's predisposition to commit the charged offense or any lesser included offenses.

We conclude that the trial court's error in omitting the portion of the pattern jury instruction regarding first aggressor proof qualified as a non-structural constitutional error because it violated the Defendant's right to a jury trial. Specifically, the instruction violated the right to a jury trial because it failed to inform the jury that it could only consider the State's proof regarding the Defendant's rap lyrics/videos for the purpose of rebutting the defense proof that the victim was the first aggressor and not as evidence of the Defendant's predisposition to commit the charged offense of any lesser included offenses. See Cole-Pugh, 588 S.W.3d at 260 (stating that a criminal defendant has "a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial." (internal quotation marks and citation omitted)). Notably, the State has the burden of showing that a non-structural constitutional error is harmless. Rodriguez, 254 S.W.3d at 371. Specifically, "[t]he existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Id. (emphasis added). "'In order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Perrier, 536 S.W.3d at 404 n.8 (quoting State v. Cecil, 409 S.W.3d 599, 610 (Tenn. 2013)); see Neder v. United States, 527 U.S. 1, 15 (1999) (stating that the test for determining whether a non-structural constitutional error is harmless is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (internal quotation marks and citations omitted)). When determining whether an error is harmless beyond a reasonable doubt, "a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

We reiterate that "[t]he existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Rodriguez, 254 S.W.3d at 371. Moreover, "'[i]n order to determine whether an instructional error is harmless, the appellate court must ask whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Perrier, 536 S.W.3d at 404 n.8 (quoting Cecil, 409 S.W.3d at 610). Here, the State has failed to demonstrate beyond a reasonable doubt that the instructional error in this case was harmless. Under these facts, a rational jury could have considered the rap lyrics/video proof as evidence of the Defendant's predisposition to commit the charged offense or any lesser included offenses, including the Defendant's conviction offense of second-degree murder. Because the State has failed to demonstrate beyond a reasonable doubt that the instructional error in this case was harmless, we reverse the Defendant's conviction and remand the case for a new trial.

- 46 -

**E.** **Failure to Instruct that Self-Defense Also Applies to Lesser Included Offenses.** The Defendant next contends that the trial court erred in failing to instruct the jury that self-defense applies not only to the charged offense but also to the lesser included offenses. He claims that although the trial court instructed the jury on self-defense, it did not instruct that "to convict the defendant of the charged offense <u>or any lesser included offenses</u>, the state must prove beyond a reasonable doubt that the defendant did not act in self-defense." The Defendant claims that because the instruction given in his case failed to alert the jury that self-defense could apply to both the charged offense and all lesser included offenses, he was denied due process of law. In response, the State contends that the trial court, who followed the pattern jury instruction, was not required to issue the self-defense instruction with each lesser included offense. We agree with the State.

At the motion for new trial hearing, appellate counsel argued that the problem with the pattern jury instructions was "they don't consider lesser included offenses in tandem with each other" and that the remedy was to instruct the jury that self-defense "applies to the charge and any lesser included offenses." The State countered that the pattern jury instruction, which was given to the jury, was sufficient.

In its order denying the motion for new trial, the trial court noted that "[t]he jury charge instructed the jury that first-degree murder embraced the lesser included offenses of second-degree murder and voluntary manslaughter" and instructed "that the burden was on the [S]tate to prove beyond a reasonable doubt that [the Defendant] did not act in self-defense for him to be found guilty." The court then concluded that it was "implicit" that "self-defense is . . . a defense to any conviction." The court also recognized that the Defendant never requested the suggested instruction and never cited law to support that such an instruction is required, "although its inclusion would be appropriate."

Here, the trial court provided the following jury instruction to the jury:

> The burden is on the State to prove beyond a reasonable doubt that [the Defendant] did not act in self-defense.

> To convict [the Defendant], the State must have proven beyond a reasonable doubt that he did not act in self-defense. If from all the facts and circumstances you find that he acted in self-defense, or if you have reasonable doubt as to whether [he] acted in self-defense, you must find him not guilty.

We agree with the State. The trial court followed the pattern jury instruction for self-defense and clearly informed the jury that if it found the Defendant acted in self-defense, or if it had reasonable doubt as to whether he acted in self-defense, then it was

required to find the Defendant not guilty. See State v. Slimick, No. M2014-00747-CCA-R3-CD, 2015 WL 9244888, at *20 (concluding that the instructions, when read as a whole, "adequately convey[ed] the State's burden of proof regarding self-defense" and that "the defendant's constitutional rights were not violated by the trial court's failure to include the State's duty to negate self-defense multiple times in the instructions"). Accordingly, we conclude that the instructions on self-defense were adequate to protect the Defendant's constitutional right to due process. However, our conclusion that the instructions on self-defense did not violate the Defendant's constitutional rights "does not preclude the conclusion that the State's burden to negate self-defense might be further clarified." Id. at *21.

**F.      Failure to Instruct on Code section 39-11-201(a)(3) Within Definition of the Charged Offense and Lesser Included Offenses.**  The Defendant argues that the trial court violated his constitutional right to a jury trial and to due process by failing to instruct on Code section 39-11-201(a)(3), regarding the State's burden to negate self-defense, within the definition of the charged offense and the lesser included offenses of second-degree murder and voluntary manslaughter. The Defendant claims that "it is not enough to charge self-defense in isolation" and asserts the jury should have been instructed that, in addition to proving the elements of the offense beyond a reasonable doubt, the State also had to negate self-defense beyond a reasonable doubt. As a result, he urges this court to adopt a new jury instruction for second-degree murder and voluntary manslaughter that includes the element that "the killing was not done in self-defense." The State contends that this court has previously rejected appellate counsel's comparable proposed jury instructions on self-defense and asserts that the jury in the Defendant's case was instructed on self-defense before it began deliberating. See State v. Ferrell, No. M2015-01011-CCA-R3-CD, 2016 WL 6819784, at *17 (Tenn. Crim. App. Nov. 18, 2016) (concluding that the trial court did not err in rejecting the defendant's requested jury instructions on the State's burden to negate his claim of self-defense because the pattern instructions given included a correct and complete charge of the law regarding the State's burden to negate a claim of self-defense); Slimick, 2015 WL 9244888, at *20 (Tenn. Crim. App. Dec. 17, 2015) ("While the requested instruction was not given in conjunction with the other statutory requirements, the jury instructions clearly informed the jury that the State bore the burden of negating self-defense beyond a reasonable doubt and that if the jurors had reasonable doubt that the defendant acted in self-defense, they were to acquit her."). We conclude that the pattern jury instructions given in this case were sufficient to instruct the jury regarding the State's burden to negate his claim of self-defense.

Code section 39-11-201(a)(3) provides that "[n]o person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt: . . . (3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense." The Defendant asserts the following amended charge,

which includes the State's burden of proof regarding the negation of self-defense for each offense, is necessary to protect his federal and state rights to a jury trial and to due process:

SECOND DEGREE MURDER (KNOWINGLY KILLING OF ANOTHER)

Any person who commits Second Degree Murder is guilty of a crime.

For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victim;

and

(2) that the defendant acted knowingly;

and

(3) that the killing was not done in self-defense;

The distinction between Second Degree Murder and the lesser offense of Voluntary Manslaughter is that Voluntary Manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

If you unanimously find the defendant guilty of second degree murder beyond a reasonable doubt, you shall return a verdict of guilty for that offense. If you unanimously find the defendant not guilty of that offense or have a reasonable doubt of the defendant's guilt of that offense, you shall then proceed to consider whether or not the defendant is guilty of the next lesser included offense, which is voluntary manslaughter.

LESSER-INCLUDED VOLUNTARY MANSLAUGHTER

Any person who commits Voluntary Manslaughter is guilty of a crime.

For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1)     that the defendant unlawfully killed the alleged victim;

and

(2) that the defendant acted intentionally or knowingly;

and

(3) that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner;

and

(4) that the killing was not done in self-defense.

The distinction between Voluntary Manslaughter and the greater offense of Second-Degree Murder is that Voluntary Manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

If you unanimously find the defendant guilty of voluntary manslaughter beyond a reasonable doubt, you shall return a verdict of guilty for that offense. If you unanimously find the defendant not guilty of that offense or have a reasonable doubt of the defendant's guilt of that offense you shall find him not guilty.

During the charge, the trial court provided the following instruction regarding the State's burden of proof in self-defense:

The burden is on the State to prove beyond a reasonable doubt that [the Defendant] did not act in self-defense. To convict [the Defendant], the State must have proven beyond a reasonable doubt that he did not act in self-defense. If from all the facts and circumstances you find he acted in self-defense or if you have a reasonable doubt . . . that he acted in self-defense, you must find him not guilty.

- 50 -

At the motion for new trial hearing, appellate counsel asserted that it was "not enough . . . to charge self-defense in isolation" because you must charge self-defense with the other elements the State has to prove beyond a reasonable doubt. The State countered that the pattern jury instructions, which were given to the jury, were sufficient.

In its order denying the motion for new trial, the trial court reiterated that "[t]he jury charge instructed the jury that first-degree murder embraced the lesser included offenses of second-degree murder and voluntary manslaughter" and instructed "that the burden was on the [S]tate to prove beyond a reasonable doubt that [the Defendant] did not act in self-defense for him to be found guilty." The court asserted that it was "implicit" that "self-defense is . . . a defense to any conviction." The court also recognized that the Defendant never requested the proposed instructions and never cited any case law supporting that such instructions are required.

We agree with the trial court that the Defendant never requested the aforementioned instructions at trial. See Tenn. R. Crim. P. 30(a). Moreover, the record shows that the jury, before its deliberation, was clearly instructed on the State's burden to negate the Defendant's claim of self-defense beyond a reasonable doubt and was told if it had a reasonable doubt that the Defendant acted in self-defense, it must acquit him. See State v. Floyd, No. M2017-00272-CCA-R3-CD, 2018 WL 1560079, at *12 (Tenn. Crim. App. Mar. 29, 2018); Ferrell, 2016 WL 6819784, at *17; Slimick, 2015 WL 9244888, at *20. We reiterate that "[j]urors bring a common-sense understanding of self-defense to deliberations." Slimick, 2015 WL 9244888, at *20. The instructions given in this case, when read as a whole, properly explained the State's burden of proof regarding self-defense. Because "the [D]efendant's constitutional rights were not violated by the trial court's failure to include the State's duty to negate self-defense multiple times in the instructions," we conclude the trial court did not err in failing to provide the proposed jury instructions. Id. The Defendant is not entitled to relief on this issue.

## CONCLUSION

The trial court abused its discretion in admitting evidence of the Defendant's rap lyrics/videos, and this error was not harmless. The trial court also erred in failing to instruct on "first aggressor proof" in conjunction with the self-defense instruction, and this error was not harmless beyond a reasonable doubt. Accordingly, we reverse the Defendant's conviction for second-degree murder and remand this case to the trial court for a new trial.

s/                    Camille                    R. McMullen_____

- 51 -

CAMILLE R. MCMULLEN, PRESIDING JUDGE